Argued February 3; modified June 14; rehearing denied
July 12, 1938

## MARSHALL ET AL. *v.* FRAZIER

(80 P. (2d) 42, 81 P. (2d) 132)

Department 2.

*Ralph H. Cake* and *Nicholas Jaureguy*, both of Portland (Cake & Cake and Jaureguy & Tooze, all of Portland, on the brief), for appellants.

*Arthur I. Moulton*, of Portland, for respondent.

BAILEY, J. This suit was instituted by the plaintiffs, Joseph W. Marshall and Lawrence C. Marshall,

for an accounting by the defendant, Charles R. Frazier, of all assets coming into his possession or under his control as trustee for the said plaintiffs. From a decree fixing and determining the amount of the trust estate, the trustee's compensation and fees to his attorney, the plaintiffs have taken this appeal.

The plaintiffs are the grandsons of Colin C. Frazier. On July 3, 1906, the grandfather executed his last will and testament, in which he named Turner Oliver and the defendant, Charles R. Frazier, as executors. By this will he devised and bequeathed all his property, real and personal, to the defendant herein as trustee for the use and benefit of the testator's widow and his two children, Marie Frazier, who became the mother of these plaintiffs, and George Frazier. The will directed that all the personal property be divided equally between the testator's two children when the younger, George, should reach the age of twenty-one years, and that upon George's reaching the age of thirty years the title to certain real property should vest in him and his sister, respectively. A specific bequest of an annual payment to the widow, made a charge on the testator's entire estate, is not here important, inasmuch as the widow died before George reached the age of twenty-one years.

Prior to June 3, 1907, Colin C. Frazier died, and on that date his will was admitted to probate. Thereafter, on or about July 18, 1908, an order was entered approving the final report of the executors and directing that the remaining assets of the estate be turned over to the defendant as trustee under the will.

Before the estate was closed, however, Marie Frazier on December 25, 1907, married Joseph W. Marshall. Two days before her marriage, on December 23, 1907, Marie Frazier, under her full name of Anna

Marie Frazier, executed and delivered to the defendant an instrument in the form of a deed, whereby she conveyed to the defendant and William Frazier and their successors and assigns, as trustees, all her interest in the estate of her late father, Colin C. Frazier. By this instrument it was provided that the trustees were to pay to her annually during her lifetime the net income from the said property after deducting all necessary charges and expenses of administering the trust. Upon her death, if she left any child or children surviving her, the trustees were to pay the income from said property to such child or children, or to their legal guardian, "until the youngest of such children shall reach the age of thirty (30) years, and shall thereafter pay the principal of said property to such child or children or to the children of a deceased child." William Frazier died shortly after the execution of this instrument, leaving as sole trustee Charles R. Frazier.

On March 29, 1909, George Frazier became twenty-one years of age, and the defendant as trustee under the will of Colin C. Frazier, and in pursuance of the provisions thereof, delivered in equal shares to George Frazier and his sister, Marie Frazier Marshall, the personal property of the Colin C. Frazier estate. No question is here raised concerning the right of said Charles R. Frazier, either as trustee under the will of Colin C. Frazier, deceased, or under the trust instrument of Marie Frazier Marshall, to distribute to Marie Frazier Marshall at that time one-half of the personal property of her father's estate. Nor is there any claim that she did not receive her full share, which amounted to approximately $12,000 in value.

George Frazier became thirty years of age on March 29, 1918, and according to the trust provisions of the will of Colin C. Frazier, the defendant was required

then to turn over the real property to him and his sister. Marie, however, had died on May 18, 1915, survived by her husband, Joseph W. Marshall, Senior, who died in 1918, and the plaintiffs, who in 1915 were of the ages respectively of one and four years.

The real property which was specifically devised by Colin C. Frazier to Charles R. Frazier in trust for Marie Frazier consisted of two farms in Union county, one of 160 acres and the other of 433 acres, and city lots in Portland on Hawthorne avenue, which will hereinafter be mentioned as the Hawthorne avenue property.

On or about August 20, 1917, the defendant, presumably as trustee under the will of Colin C. Frazier, sold to William Webster the 160-acre farm, for a consideration of $18,500. On that date Webster paid $3,000 of the purchase price, and on January 21, 1918, paid an additional $2,000. The 433-acre farm was sold, on or about August 20, 1917, to Floyd McKennon, for $45,000, toward which purchase price McKennon then paid the sum of $5,000. In each instance a mortgage was given for the balance of the purchase price. Both of these sales were made by the defendant prior to the time that George Frazier reached the age of thirty years and therefore prior to the time when the title to the said real property was, according to the terms of the Colon C. Frazier will, to vest in Marie Frazier Marshall or her heirs.

Out of the $10,000 cash payments made on the two properties, as above mentioned, the trustee paid $2,-378.28 in real estate brokers' commissions and $173.92 for sundry expenses; Liberty bonds were purchased with $500; and a loan of $6,700 was made to Joseph Healy.

In 1934 the plaintiffs herein requested the defendant to render an accounting of his trusteeship. He thereupon engaged Arthur Berridge & Company, cer-

tified public accountants and auditors, of Portland, to prepare an accounting. The report of the accountants divides the trusteeship into two periods, one from 1909 to April 1, 1918, and the other from April 1, 1918, to June 30, 1934. April 1, 1918, apparently was selected as the dividing line between periods for the reason that George Marshall did not reach the age of thirty years until March 29 of that year.

The defendant had kept no books of account from 1908 to 1934, under either the Colin C. Frazier will or the Marie Frazier trust deed. The difficulty experienced by the accountants in making up a set of books is described by Mr. Berridge, as follows: "Well, there were no books and records, your Honor, but just a mass of papers, produced. There were canceled checks, there were bank deposit slips, and there were contracts and deeds, miscellaneous legal documents, and the first thing I did, I took the bank deposit slips and arranged them by years, and then I took the years and arranged them by months, until I got it in chronological order. I did the same with the disbursements. Then I got some loose sheets of paper and from the bank deposit slips I made up a cash record of receipts and traced the deposits to the bank, and then from the checks I made up a record of cash disbursements, and with that information from what I call a loose-leaf cash book then I constructed ledger accounts, charging and crediting the ledger accounts with the information I had from these cash sheets, and from that ledger I prepared the report a copy of which" appears in the record. The defendant assisted the accountants, as much as he was able, in making up the books.

According to the report thus prepared, the trust estate of Marie Frazier Marshall held by the defend-

ant as trustee for these plaintiffs on April 1, 1918, consisted of the following assets:

| | |
|---|---:|
| William Webster mortgage | $13,500 |
| Floyd McKennon mortgage | 40,000 |
| Loan to Joseph Healy | 6,700 |
| Liberty bonds | 500 |
| Hawthorne avenue property (estimated) | 5,000 |
| Cash in bank | 247.80 |
| Total | $65,947.80 |

The appellants in their opening brief state that they did not at the trial of the case, nor do they now, "make any complaint with respect to the management of the original trust arising under the will of Colin Frazier —nor do we make any objection to the management of the Marie Frazier Marshall estate prior to 1918, when respondent as trustee of the latter estate obtained and sold the real property. Indeed, we have made no particular investigation or inquiry as to the handling of the estate prior to that date. This controversy revolves about our respective contentions regarding the manner in which respondent spent the proceeds of the real property."

The respondent, while agreeing that his management of the Marie Frazier Marshall trust estate prior to 1918 is not questioned by the appellants in this suit, asserts that in order to determine the whole amount of compensation to be allowed him as trustee the court should take into consideration all the services rendered by him as such trustee under both the Colin Frazier will and the Marie Frazier Marshall trust deed.

The accountants thus summarized as of June 30, 1934, the net worth of the estate created by the latter instrument:

ASSETS

Current Assets:

| | | |
|---|---|---|
| Cash in bank | $ 130.32 | |
| Bonds (book value, $11,-144.40), market value | 2,326.25 | |
| Stocks (book value, $14,-921.53), market value | 3,340.00 | |
| Oil stocks (book value, $5,-934.07), market value | None | |
| Loans receivable (book value, $20,251.65), realizable estimate | 15,243.10 | $21,039.67 |

Fixed Assets:

| | | |
|---|---|---|
| Farm in Union county | 12,743.31 | |
| Overlook Addition property | 4,579.81 | |
| Hawthorne avenue property | 3,000.00 | 20,323.12 |
| | | $41,362.79 |

LIABILITIES AND NET WORTH

Current Liabilities:

| | | |
|---|---|---|
| Charles R. Frazier | 3,677.38 | |
| Arthur Berridge & Company | 350.00 | |
| Suspense | 212.50 | 4,239.88 |

Net Worth _____ $37,122.91

From the foregoing report it appears that the capital assets of the estate had, from April 1, 1918, to June 30, 1934, diminished in value from $65,947.80 to $37,122.91. In making the above compilation the accountants took into consideration the following facts: One-half of the 433-acre farm in Union county, which had originally been sold to Floyd McKennon, was later sold by him to Fred A. Morse. The other half reverted to the trust estate, and at the time it was taken back there was a balance of $12,743.31 unpaid on the purchase price, which balance is taken by the accountants

as the value of that part which is now owned by the trust estate. The house and lots on Hawthorne avenue were sold, about 1925, for $8,000, and there remains an unpaid balance of $3,000 on their purchase price.

The house on the Hawthorne avenue property was burned several years prior to the accountants' report, and the purchasers of the property had been endeavoring to induce the defendant to accept a reconveyance of the lots and cancel the balance due on their mortgage. For that reason the accountants have explained that in the above tabulation they refer, under the heading of "Fixed Assets", to the Hawthorne avenue property as distinguished from the mortgage thereon held by the defendant.

The Overlook property consisted of a house and a lot. In June, 1925, the defendant purchased a second mortgage on the premises for $1,430, and in February, 1928, the first mortgage, amounting to $3,000, was also purchased by him. Later he paid street assessments amounting to $149.81, making a total of $4,579.81 paid by him, which is the amount given by the accountants as the value of this property. The report indicates that the defendant eventually acquired title to the property without any additional outlay.

The plaintiffs, as beneficiaries of the Marie Frazier Marshall trust estate, received from April 1, 1918, to June 30, 1934, sums aggregating $33,723.71. Inasmuch as during that period there was, according to the accountants' report, a shrinkage of $28,825.89 in the assets comprising the trust estate, only $4,897.82 of the amount paid to the beneficiaries is credited to net income, and the balance to capital.

In the circuit court the plaintiffs specified their objections to the accountants' report under fourteen headings. Some of these objections were sustained

by the trial court and will be referred to here briefly only, for the purpose of showing the nature of the transactions carried on by the trustee and as bearing on the compensation due him as trustee. We shall take up the classifications in the order in which they have been presented to us in the appellants' brief.

### 1. *William Webster Mortgage*

On April 1, 1918, the trust estate had on hand the Webster mortgage of $13,500. Payment of all except $3,000 of that sum is accounted for in the audits. On January 7, 1924, Webster made payment of an installment of principal with interest, which left a balance of $3,000 due on the principal. About that date the mortgage was satisfied by the defendant. According to his testimony, the defendant does not remember having received this $3,000, but is confident that it must have been paid to him. Therefore, this $3,000 was charged by the circuit court to the defendant. The findings of the court are to the effect that this $3,000 was deposited in the bank as a part of the funds of the trust estate, "although the said account does not account therefor". It was further found by that court that the said moneys were "intermingled with other moneys of said estate, and invested and reinvested by said trustee from the time the same were received as aforesaid, and that said defendant as trustee is not chargeable with interest on account thereof but is chargeable with the said principal sum of $3,000." The record fails to disclose that the said $3,000 was ever deposited in the bank as a part of the trust estate funds or that it was ever invested by the trustee for the benefit of the trust estate. The trustee therefore is chargeable not only with this sum, $3,000, but also with interest thereon from the date of receipt of the money

by him. Whether the plaintiffs have already received the benefit of this interest will be discussed later, when we refer to the interest received by the trust estate on the Parker & Banfield notes.

## 2. *Charles R. Frazier, Personal*

Beginning in June, 1918, the defendant borrowed from the trust funds numerous sums of money. In July, 1919, he had repaid all moneys that he had previously so borrowed. Dated January 29, 1924, the accountants have shown a charge against him of $15,500 due the trust estate. In reconstructing the books they charged to the defendant, under date of June 30, 1934, the balance of $3,000 on the Webster mortgage, the item of $228.88 as money due from Ralph L. Brackett, and the sum of $115, which was the unpaid balance on a loan made to William E. Perry. The total charged to Frazier on that date amounted to $18,843.88. Against the total so charged the accountants credited the defendant with the sum of $5,000, which was used by him in the purchase of certain oil stocks to which we shall hereinafter refer in some detail; the sum of $1,979.50, deposited in the trust fund by the defendant, the source of which he was unable to state; the sum of $300, which is described as an overpayment on the loan made to Joseph Healy; and the sum of $15,241.76, which remained as a credit from the two Parker & Banfield notes, hereinafter explained. This, according to the auditors' report, left a net credit of $3,677.38 in favor of Charles R. Frazier.

The circuit court found that the trust was indebted to the defendant in the sum of $1,506.66. In fixing this amount the defendant was given credit, among other things, for the $300 and the $1,979.50 referred to in the accountants' report, with interest. It is now

urged by the appellants that these items should not have been credited to the defendant's account, but should be considered as part of the assets of the trust. It is not certain by whom or for what purpose the $300 was paid to Frazier, and it is merely assumed that it was an overpayment by Healy on his $6,700 mortgage. The entire amount of principal and interest on the Healy loan has been received by the defendant and he has accounted for it. The decree gives Frazier credit for the $300 as of March 31, 1918, which is approximately the date on which Healy paid the first installment on his mortgage. Interest is allowed by the court from that date.

The $1,979.50 is comprised of the following sums: two items of $300 and $600, respectively, received from Pendleton by the defendant and deposited by him in the trust account March 8, 1922, and $1,079.50 received from an East Portland bank. Interest was allowed by the trial court on this $1,979.50 from March 8, 1922.

■ Mr. Frazier was interested in a number of enterprises, and we think, from the entire record, that both these items, $300 and $1,979.50, belonged to him individually and were inadvertently deposited in the trust account. The defendant has tried to cooperate to the utmost of his ability in accounting for all the money that he received as trustee. There is no evidence that tends to establish that these items, or any part of them, should be treated as belonging to the plaintiffs. If the $300 in fact represented an overpayment by Healy on his mortgage, it did not thereby become a part of the trust fund. Inasmuch as these sums of money have been paid into the trust fund and invested by the trustee and the income therefrom has been distributed for the benefit of the plaintiffs, the defendant is entitled to interest on the said sums from the date of their pay-

ment into the trust estate. These sums, $300 and $1,979.50, were intermingled with trust moneys, and to the extent and for the time that any part of the trust fund remained idle in the bank the amount of interest payable to the defendant should accordingly be reduced. The record, however, does not disclose, so far as we have been able to ascertain, that any appreciable sum of money belonging to the trust remained idle in the bank for any length of time.

3. *Oil Stock*

During the years 1923 and 1924 the defendant purchased with trust funds 20 shares of common stock in the Oregon-California Oil Company, an Oregon corporation; 20 shares of the common stock of The Virginian, Inc., a California corporation; and 10 interests in the Petroleum Products Syndicate. He paid $2,000 each for the blocks of stock in the first two corporations mentioned, and $1,000 for the interests in the syndicate. During the years 1924, 1925 and 1926 the defendant paid $934.07 in assessments on these stocks and interests. These concerns were not producing companies, but were merely engaged in drilling for oil. No income was ever received from the stocks and interests mentioned, and they have been classified by the accountants and all parties concerned, as being of no value.

All the certificates for these various shares and interests were issued to the defendant individually and not as trustee, although subsequent to their delivery to him the defendant had written on them in lead pencil, following his name, the word "trustee". The ownership of the stock, however, was never transferred on the books of the corporations to the defendant as trustee. From the defendant's own testimony it is

apparent that he considered this venture more as a speculation than an investment. It was indeed wholly a gamble. Later in this opinion, after we shall have referred to other items, we shall discuss to some extent the law relating to the investment of trust funds. It is well, however, to state here that the defendant should be charged personally with the amount of money expended by him in oil stock purchases and assessments, together with interest thereon from the dates, respectively, of such purchases and payments.

## 4. Crescent Paper Company

The defendant owned in excess of 30 per cent of the stock of the Crescent Paper Company, of which concern he was president. Ralph L. Brackett owned an equal interest in the company, and the balance of the stock was held by one or two other owners. From August, 1919, to March 19, 1924, the defendant advanced to the paper company large sums of money, and the record shows that on the latter date the amount which that company then owed the trust estate was in excess of $19,000. Of this sum, however, $12,000 was repaid in 1925. Later the company went out of business, leaving a balance of $2,258.24 due the trust estate. In making up the books the accountants offset the amount due by deducting a like amount from the money received on the Parker & Banfield notes. From 1920 to 1925 there was paid by the paper company as interest the sum of $1,769.50. The only objection made by the appellants to this subdivision of the account is that the court did not allow them the interest to which they contend they are entitled.

It will be necessary at this point to refer briefly to the Parker & Banfield notes. Prior to May, 1922, Charles R. Frazier, his mother and others sold to Par-

ker, Banfield and others, herein mentioned for convenience as Parker & Banfield, some real property in the city of Portland. As security for the purchase price or a part thereof, Parker & Banfield gave notes aggregating $25,000, secured by a mortgage on the property purchased. Two of those notes, each for $8,750 and payable to Frazier and Brackett, respectively, were turned over to the trust estate, and it received as interest on said notes from May 22, 1922, to February 16, 1928, the sum of $6,343.75. On the latter date the principal of both notes, amounting to $17,500, was paid to the estate.

It is the defendant's contention that the two notes and the mortgage securing them were assigned to the trustee as security for the moneys which were loaned from the trust estate to the paper company and to Brackett and the defendant. We have already pointed out that on March 19, 1924, the paper company was indebted to the trust fund in a sum in excess of $19,000. On that same date the defendant was individually indebted to the trust fund in the sum of $10,500, while Brackett then owed the estate $3,000. It is therefore apparent that the sum of these two notes, $17,500, was not equal to the indebtedness owed by the paper company, much less what was due from that company and the defendant and Brackett.

The plaintiffs, in arriving at the amount of interest for which they contend they should be given credit on the Crescent Paper Company account, have computed interest at the rate of 6 per cent per annum on all loans, except one for $5,000, from the respective dates they were made until June 30, 1934, the date of the audit; and they have credited the defendant with interest on the $12,000 payment from the date it was made by the paper company, June 2, 1925, until June

30, 1934. There is thus a balance of $3,100.42 which the plaintiffs contend is not credited to them as interest.

The $5,000 loan was effected by the defendant's signing a note for that amount, payable to the bank, and turning over the proceeds to the paper company. The principal and interest were paid by the paper company, and this loan may therefore be disregarded as far as these litigants are concerned.

In making the above computation of interest the plaintiffs did not take into consideration the sum of $2,258.24 paid on the Parker & Banfield notes and credited to this account by the auditors as of June 30, 1934, but which was actually received by the trust on February 16, 1928. Interest at 6 per cent per annum on this latter amount from the date of its receipt by the trust estate to June 30, 1934, amounts to approximately $858 and should be credited to the defendant and deducted from the $3,100.42 claimed by the plaintiffs.

In connection with the Crescent Paper Company account the plaintiffs also contend that the court did not allow the entire amount of interest which was due them on the Ralph L. Brackett account. They state that the balance of interest for which they are not given credit is $474.65. This amount was computed by the same method employed to determine the state of the paper company's account. The plaintiffs, however, did not credit to the defendant any interest on the $228.88 transferred from the Parker & Banfield note account to the Brackett account. This sum was received by the trust on February 16, 1928, and interest thereon at 6 per cent from that date to June 30, 1934, amounts to approximately $86.

The amount of interest to June 30, 1934, for which the plaintiffs claim they have not been given credit, on the Crescent Paper Company account is computed by them as $3,100.42, and on the Brackett account to that date as $474.65, or a total of $3,575.07. We have already pointed out that in making this computation the plaintiffs did not give the defendant a credit of $858 on the paper company account and $86 on the Brackett account, or a total of $944, which, deducted from the amount claimed by the plaintiffs, leaves $2,631.07. Whether or not the trial court has given the plaintiffs credit for this interest we are unable to determine from the findings of fact or the decree.

The interest paid on the Parker & Banfield notes from May 22, 1922, to and including February 16, 1928, the date of payment of the principal of the said notes, amounted to $6,343.75, which is more than sufficient to offset the interest for which the plaintiffs claim they were entitled to, but not given, credit on the Crescent Paper Company, Brackett and Webster accounts.

We do not find anywhere in the record any direct reference to the court's having taken into consideration, in adjusting the accounts between the plaintiffs and the defendant, this $6,343.75 paid as interest on the Parker & Banfield notes, although the court possibly did figure, in a general way, that the amount so paid in interest would offset the respective balances which the auditors' books disclosed as interest not paid on those three accounts. Unless the defendant was in fact given credit otherwise for this amount paid as interest, then he is entitled to have it entered now as a credit in his favor. If he has already been credited with the amount, then the plaintiffs are entitled to interest on the $3,000 Webster final payment from the time it was received by the defendant, together with the amount

of interest computed by the plaintiffs on the Crescent Paper Company and Brackett accounts, as hereinabove modified.

## 5. *Fag-O-San Company*

The report of the accountants shows that from January, 1924, to and including January, 1925, the defendant loaned to the Fag-O-San Company and invested in its stock sums aggregating $7,188.55. The first entry in the ledger shows that this company paid to the defendant $251.45. This payment is not explained. The entire account of the course of dealings between the defendant and this company is very vague. At the inception of negotiations with this company, the defendant, according to his testimony, gave to it a note for $2,500, on which the company obtained money from a bank; and on January 10, 1924, the defendant as trustee paid to the bank as principal of the note plus interest, the sum of $2,561.67. The defendant does not remember whether the note was given by him individually or as trustee. Prior to payment of this note the defendant, on January 7 of that year, paid to another bank the sum of $2,200 principal and $76.88 interest on some note, which total amount is charged to the Fag-O-San account, in the auditor's report.

Under date of September 24, 1923, the Fag-O-San Company issued to the defendant in his individual name a certificate for 30 shares of its common stock at a par value of $100 per share. There was inserted in this certificate by Frazier, after his name in typewriting, the abbreviation "Tr." in lead pencil.

The accountants and the defendant likewise seem to have treated the defendant's transaction with this company as a loan by him to it. Approximately one year after the above payments on these notes were

made by the defendant, the Fag-O-San Company was declared a bankrupt. On January 8, 1925, the defendant purchased from the receiver in bankruptcy the assets of the said company for $750, and later attempted to re-establish the Fag-O-San Company, in which effort he spent an additional $1,000. He was unsuccessful in this attempt and the company went out of existence. In the liquidation which followed he received during the year 1929 the sum of $2,170, and in 1931 an additional $10. This left a balance of outlay, over and above returns, of $5,008.55.

The circuit court, in referring to this account, observed that the venture was "an unfortunate exercise of sound discretion on the part of the trustee, but he is not to be surcharged with it", and the decree of the court did not charge the defendant with any part of this account. The defendant, in his brief, states that, "An extended discussion of the investment in the affairs of this company would not benefit the court." We are in full accord with this view.

6. *Margaret E. Frazier* 7. *William A. Pomeroy*

8. *Northwest Delta Upsilon Corporation*

9. *William E. Perry*

These accounts are all charged against the defendant. It is advisable, nevertheless, to explain them briefly, as they have some bearing on the amount of compensation to which the defendant is entitled for his services as trustee.

During the period from October 5, 1926, to and including April 10, 1931, the defendant loaned to his mother, Margaret E. Frazier, out of the trust funds, a total of $8,276.71. There was repaid to the fund the sum of $5,333.61, the last payment, $2,281.61, made

March 31, 1934. These loans were not in any wise secured. During part of, if not all, the time when the loans were being made the defendant was guardian of his mother. On June 30, 1934, there remained due on the principal of this account $2,943.10, and $1,991.29 in interest.

On October 8, 1925, the defendant loaned to one of his personal friends, William A. Pomeroy, $3,000 secured by a mortgage on a half interest in real property in Tulsa, Oklahoma. No interest whatever was paid on this loan, and in the summer of 1928, when the defendant sought to foreclose the mortgage he found that the entire tract had been sold for taxes for the year 1925. He further ascertained that title to the property was somewhat involved, due to the fact that on the death of Pomeroy's wife, which apparently had occurred before the loan was made, Pomeroy's family was living on the property. One of Mrs. Pomeroy's heirs was a minor child, who inherited an undivided one-half interest in the property, and, according to Oklahoma attorneys, this minor also had "a possible homestead interest under our statutes, including the right to live upon the property until it reaches majority". Regardless of this possible homestead right, it appears from correspondence between an attorney for the defendant and the lawyers in Tulsa, Oklahoma, that the one-half interest owned by Pomeroy was of a value much less than the mortgage. There appears to have been some expense for legal services connected with this loan and the attempted mortgage foreclosure, but, since the plaintiffs make no complaint concerning the same, we shall pass it.

The defendant, although not appealing from the decree of the circuit court, has requested in his brief that we reexamine this transaction and charge the same

against the trust estate. On an appeal of a suit in equity the cause is here tried *de novo* and this court is at liberty to consider the entire record in order to ascertain whether or not the result reached by the trial court was substantially correct: *Abrams v. Rushlight,* 157 Or. 53 (69 P. (2d) 1063). When a party to the litigation has not appealed, this court may not enter a decree more favorable to him than that rendered in the circuit court. This court, however, if it finds that the trial court disallowed certain items which should have been allowed or allowed other items which should have been disallowed, may readjust the entire result, although it may not grant more to the non-appealing party than was given him by the decree from which the appeal was taken: *Abrams v. Rushlight,* supra. With this in mind we have examined in its entirety the Pomeroy loan transaction, and we find that the trial court did not err in charging the defendant with the amount of the principal of said loan and interest on it.

On February 6, 1924, the defendant purchased a $500 bond of the Northwest Delta Upsilon Corporation, secured by a second mortgage on a fraternity house in Seattle. Three payments of interest, aggregating $194.58, were received from this investment, leaving due as of June 30, 1934, a balance of $617.42 in principal and interest. The defendant undoubtedly was actuated in making this loan by his own interest as a member of the Delta Upsilon fraternity.

The Perry item was an unsecured personal loan of $120 made by the defendant to William E. Perry on September 15, 1930. The accountants charged the amount of this loan with interest to the defendant personally.

As stated at the beginning of the discussion concerning these last four items, all were charged by the circuit court to the defendant, with interest.

10. *Associated Gas and Electric Debentures*

The defendant, as trustee for the plaintiffs, on April 8, 1931, purchased from himself as guardian for his mother, Margaret E. Frazier, debentures of the Associated Gas and Electric Corporation of the par value of $5,000, for $4,546.53. At that time the debentures could have been bought in the open market for $3,775. The amount which was paid by the defendant as trustee for the plaintiffs was the same that he had paid for them when he bought them as guardian for his mother. The debentures were unsecured and were "subject to $10,000,000 of senior obligations". Later, about 1934, these debentures were taken up by the Associated Gas and Electric Corporation and there were issued in lieu thereof to the defendant as trustee five-per-cent debentures of the face value of $2,500, also subject to $10,-000,000 of senior obligations.

In attempting to explain his original purchase of the debentures as guardian of his mother, the defendant says: "My recollection of that transaction was that I bought them for the boys, and my mother had a little money at the time and the boys didn't and it was an opportune time to buy them and . . ." At the time, however, that the defendant as trustee purchased the debentures from himself as guardian, his mother was indebted to the trust estate in excess of $4,700, and about two days later another $1,000 was advanced to her by the trust estate. When the audit was made, June 30, 1934, the market value of these debentures had decreased to $1,050; and at the time of the trial it was $1,500.

It would appear from entries in the ledger, made by the accountants, that the $5,000 worth of debentures held by the defendants bore interest at the rate of 7½ per cent per annum. The first entry of interest is that of August 5, 1931, amounting to $375, which would be interest at the above rate for one year. We find a later entry, dated March 4, 1932, which is as follows: "Assoc. Gas & Elec. Co. 5,000 sha. at 7½ for four mo., $125.00." Altogether, there was received by the trustee as interest on these debentures to June 30, 1934, the sum of $973.33.

According to one of defendant's witnesses, the original debentures have "continued to pay their interest, yet it is the consensus of opinion that the only reason that they have continued to pay their interest in full is because of the very large proportion of holders who converted their bonds [debentures] into the half the amount and allowed the company a respite in payment of full interest." The 5 per cent debentures have, according to the same witness, continued to pay interest in full. This witness also states that the latter debentures are of approximately twice the market value of those for which they were received in exchange. It is not explained, however, why debentures paying 7½ per cent interest, or even 5 per cent interest, do not have a greater market value than others of only half their face value, issued by the same corporation and paying only 5 per cent interest.

11. *Interstate Terminal Building Stock*

The defendant on January 6, 1923, paid to the Interstate Terminal Building Company out of the trust fund the sum of $500. On July 13 of the same year there was issued to him personally and not as trustee a certificate for five shares of the common stock of that corporation. A project for some sort of terminal

building was being promoted in Portland, and the defendant thus describes his purchase of stock: "I didn't have any money at the time and I thought it was a good proposition and I put $500 in it." What happened to the project is not disclosed by the record. The defendant admits that he did not receive any return on this investment and that the stock is absolutely worthless. This money was not placed in a going concern. Yet the circuit court was of the opinion that the defendant had used proper discretion in making the investment.

12. *Corporate Trust Shares*

On May 8, 1930, the defendant purchased with trust funds 500 shares in the United Oregon Corporation, for the sum of $4,937.50, and on June 11 of the same year he purchased an additional 500 shares for a like amount, making a total investment therein of $9,875. These shares were known as Corporate Trust shares and were issued by Ross, Beeson & Company of New York. About forty different kinds of high-grade common stock in American industrial organizations were pooled, forming a trust against which the corporate shares were issued. All the stocks comprising the pool were listed on the New York Stock Exchange, but the Corporate Trust shares were not so listed. According to one of the witnesses for the defendant, they were recognized by the Investment Bankers' Association of America "as a proper medium for the people who wished to invest in common stock and did not have the necessary time nor knowledge to invest in individual stocks" and who therefore "could avail themselves of the diversification represented in that type of an investment."

These certificates at first paid 70 cents a year per share, until the reserve fund was exhausted. There-

after "they paid actual earned income, which represented dividends paid by the underlying companies". The stocks comprising this pool could not be changed without consent of the holders of the trust shares. When the stock market began to decline, in 1929 and 1930, Ross, Beeson & Company put on the market what were known as Quarterly Income shares, and prevailed upon many holders of Corporate Trust shares to exchange the same for the new issue. The defendant did, on or about July 30, 1934, exchange the Corporate Trust shares for 1,647 shares of stock in Quarterly Income Shares, Inc. The certificates of these last-mentioned shares are not in the record, but it appears from statements made at the trial that they were issued to Charles R. Frazier, and, as in the instance of other such purchases, the word "trustee" is written in pencil following his name on the said certificates.

There was received in dividends on these Corporate Trust shares from July 2, 1930, when a payment of $1,316.44 was made, to June 30, 1934, the sum of $2,848.21. The value of the Corporate Trust shares as of June 30, 1934, is stated by the accountants as $2,290. At the time of the exchange, the new stocks obtained by the defendant had a value approximately equal to that of the old stock. Under the trust securing the new stock, the trustee was given authority to dispose of the various stocks comprising the pool and buy other stocks.

13. *Precision Scale Company*

During the year 1928 the defendant loaned to Precision Scale Company, without security, the sum of $2,200. Charles R. Frazier and one other individual were interested in this company. No part of the principal of the loan has been repaid, although there has been paid in interest the sum of $579. The circuit court

charged the defendant personally with this loan and interest, allowing him credit for the above amount paid.

## 14. *Phoenix Property*

At the time of his death, Colin C. Frazier was the owner of several lots in Phoenix, Arizona. On some of the parcels of land were tent houses, from which a small rental was derived. Marie Frazier, as one of the devisees under the will of Colin C. Frazier, became entitled to an interest in this property. On December 23, 1907, when she conveyed her interest in her father's estate to the defendant and William Frazier as trustees, by the trust instrument that has heretofore been mentioned and that apparently has been construed by all parties concerned as applying only to the property in Oregon, she also conveyed to the same trustees all her right, title and interest in and to all real property which she owned or to which she was entitled in Phoenix, Arizona. By this instrument of trust the trustees were required to pay to Marie Frazier Marshall annually all the income and profits from the said property, and at her death they were to convey the said property or the proceeds thereof to George Frazier, brother of Marie Frazier Marshall.

Marie Frazier Marshall died May 18, 1915. Under date of April 18, 1916, the defendant's attorney advised him that it was his duty to turn over to George Frazier all such real property or the proceeds thereof, in the event of sale. Instead of complying with the provisions of the trust deed affecting the Arizona property, as construed by his attorney, the defendant after the death of Marie Frazier Marshall and prior to April 1, 1918, paid out of the trust fund approximately $545 in taxes and assessments against the Phoenix property. The plaintiffs do not raise any question as to such pay-

ments, for the reason that they are asking for an accounting from and after April 1, 1918, only.

In December, 1920, proceedings were instituted in Arizona by the defendant herein, to have probated the estates of Colin C. Frazier and Matilda Frazier, his wife, both deceased. On November 21, 1921, orders were entered closing both those estates. In each order reference is made to the will of Colin C. Frazier, deceased, and to the provisions therein contained devising and bequeathing the estate of said Colin C. Frazier to Charles R. Frazier as trustee for the benefit of George Frazier and Marie Frazier. The orders state that Marie Frazier conveyed all her properties in Phoenix, Arizona, in trust for herself and her brother, George Frazier, "and upon her death said trustee was directed by virtue of said deed, to convey such property as he held under said trust deed to George Frazier". It is further provided in the final orders, each of which is referred to as a decree of distribution, "that the real property of the estate of said deceased as herein described and all other property of said estate, whether described herein or not, be distributed according to law and findings of fact * * * to George Frazier".

There was paid by the defendant out of the trust fund in the administration of said estates $853.60. Of this amount $600 was for fees to attorneys in Arizona, and most of the balance was for payment of taxes on the property, which had to be paid before the final orders could be entered. The last payment, $570.56, was made on January 4, 1922.

It would appear from correspondence and other evidence that George Frazier has sold and disposed of all the Phoenix property. What he actually received for the various lots is not clearly shown. There is in evidence a certified copy of a deed from George Frazier

and his wife to the Phoenix Laundry Company, dated February 10, 1923, for Lots 34 to 38, inclusive, for a consideration mentioned as $5,000. There are also certified copies of two deeds to Cassie A. Harvey for Lots 1 and 2, dated respectively March 31 and 30, 1923, each deed mentioning a nominal consideration of $10. In addition there is a certified copy of a quitclaim deed dated September 23, 1925, mentioning nominal consideration of $1, for Lots 16 and 17, to grantees named as Charles W. DeMund and wife.

From letters between George Frazier and correspondents in Phoenix it appears that George Frazier on July 23, 1921, acknowledged receipt of $1,700 as part payment on Lots 3, 4 and 5 and stated that there was a balance of $1,000 thereon remaining due. This correspondence indicates that $2,700 was not the full purchase price for those lots. Under date of July 23, 1921, George Frazier quoted $1,400 as the purchase price for Lot 34 if paid in installments, or $1,250 for all cash. This is one of the lots included in the deeds to the Phoenix Laundry Company. In a letter written to George Frazier under date of November 11, 1922, reference is made to a balance of $500 on Lot 33, with interest.

The defendant apparently did not know that any of these lots had been sold until confronted with the certified copies of deeds to some of them, at the trial. The judge of the circuit court was not satisfied with the showing made as to the Phoenix property and therefore reopened the case and requested that George Frazier be produced as a witness. The latter evidently did not know very much, if anything, concerning the amounts received from the sale of the lots.

On January 16, 1923, the defendant advanced out of the trust fund $185.55 to pay the expenses of a trip

by George Frazier to Phoenix. On March 15 of that year the defendant paid from the trust fund $657.85 for street improvements and street assessments on the Phoenix property. He justifies these expenditures for the Phoenix property on the ground that there was, as he claims, an understanding between himself and George Frazier, his cousin, that George was to convey to the defendant as trustee for the plaintiffs herein one-half of the lots in Phoenix, and that after George had made a trip to Phoenix he reported that the property was of little or no value over and above the taxes and street assessments against it, and the defendant therefore dismissed it from further consideration.

Under date of March 26, 1922, George wrote a letter to the defendant in which he stated that he had come to the conclusion ''that, perhaps, the best way to divide it [the Phoenix property] so that the Marshall children will share one-half of it, is for me to deed, say to you as trustee, enough of the lots to equal one-half of the valuation as shown on the tax returns''. The division suggested by George was that the Marshall children should have Lots 1, 2, 16, 17, 34 and 38 at the combined assessed value of $5,610, and that he should have the balance of the lots, assessed at $5,685. Concerning this matter George further wrote as follows:

''Lots 37 & 38, as I understand it, are lots that Marie owned herself and were deeded to you in trust to be delivered to me in case of her death. All of the other lots are accounted for in the decree of the court except the ones that I own personally. * * *

''There are some taxes that I have paid on this property that the children should pay on receiving this interest, and on the other hand there are some taxes that I should pay that you paid out of your funds. This can be adjusted, on final settlement.

"If you think this is a good way to make the division, I will make the deeds to you as trustee for the children, so we can close this thing up once for all.

"As I remember the agreement regarding the one-half interest, I was to give the children their interest, providing they pay the expense of administration and return the note that I gave Marie."

This letter seems to have been in answer to one from the defendant dated March 2, 1922, in which the defendant enclosed "the decree conveying to you the balance of the Phoenix property which you previously did not own". In that letter the defendant further stated: "Now I believe the proposition was for you to convey half of this to the Marshall children and they to give up your note which they now hold." No other reference is made to the conditions governing the conveyance of this property by George to Marie's children, except the suggestion that it should be conveyed to a trustee. The record fails to disclose any reply by the defendant to George's letter of March 26, 1922.

Prior to the exchange of the foregoing two letters, George had sold Lots 3, 4 and 5 and had received at least $1,700 in part payment of the purchase price. He had also sold Lot 33, and on December 2, 1921, the purchaser wrote to him regarding payment of a balance of $500 on the purchase price of that lot. Those lots are four of the seven that George Frazier had suggested for retention by himself. The other lots that he stated he would retain, 35, 36 and 37, were, together with Lots 34 and 38, which he had suggested be conveyed to the plaintiffs, conveyed by him by deed of February 10, 1923, to the Phoenix Laundry Company. Two of the other lots which the plaintiffs were to receive, as already pointed out, were conveyed by George to other grantees in March, 1923. Apparently no attempt was

made by the defendant to have George pay the costs of administration of the estates of Matilda and Colin C. Frazier, deceased, or to pay the taxes which were required to be paid before those estates could be closed, although it appears that on July 23, 1921, George had received $1,700 as part payment for some of the lots and before that time had received payment on others.

In referring to the Phoenix property, the circuit judge in his written opinion stated: "Considerations in this matter seem to lead to but one conclusion and that is one of not much satisfaction to the court, but the court cannot find where in the conduct of the trustee there can be located any bad faith, dishonesty or other premise than where uncertainty and lack of knowledge and trusting to George Frazier to do the right thing sort of misguided the trustee. In the meantime the trustee did what he thought best to protect the beneficiaries, which led into an expensive experience from which there seems to be no way by which the trust estate can be made whole and an injustice not done the trustee. This item will not be surcharged."

From February 3, 1920, to and including March 15, 1923, there was paid out of the trust fund by the defendant on account of the Phoenix property, a total of $3,112.53 in taxes, street assessments and improvements, and costs of administration in Arizona of the estates of Colin C. Frazier and Matilda Frazier, deceased. In addition to the foregoing expenses the defendant appears to have paid on February 20, 1922, to his local attorney $260 for services in connection with the Phoenix property.

Colin C. Frazier in 1906, at the time he made his will, was fifty-three or fifty-four years of age and in delicate health. The defendant, his nephew, was thirty-four or thirty-five years of age and had acquired con-

siderable experience in business in Portland. It was at the earnest solicitation of his uncle that the defendant agreed to act as trustee for the benefit of Colin C. Frazier's son and daughter.

The provisions of the trust contained in the will granted to the trustee power to convert all the personal property of the estate into money ''and keep the same loaned out on good real estate security'' and to use the income therefrom for the care and education of the testator's two children.

The document with which we are principally concerned here is the trust deed executed by Marie Frazier on December 23, 1907, after the death of her father, Colin C. Frazier, by which instrument she conveyed or transferred all her interest in the real property of her father in Oregon not to Charles R. Frazier alone but to him and William Frazier and their successors and assigns. By this trust deed the trustees were required to pay the net income from the trust property annually, after deducting all necessary charges and expenses, to Marie Frazier during her lifetime, and upon her death the income was to be paid to any child or children she had surviving her. The corpus of the estate was not to be distributed until the youngest child should reach the age of 30 years. At the time of Marie Frazier's death, May 18, 1915, her youngest child was one year old, and therefore the corpus of the trust estate is not to be distributed until sometime in the year 1944.

After making the foregoing provisions the trust deed requires that the trustees ''shall hold said trust subject to the conditions hereinbefore expressed, and may, at their discretion, sell any part or the whole of said real or personal property as in their discretion they shall deem advisable, * * * and collect and receive the proceeds of such sales, and invest and re-

invest said proceeds in such property and securities as they shall deem best.'' William Frazier, one of the co-trustees, died shortly after the execution of this instrument, as hereinbefore stated, and the administration of the trust estate has been carried on by Charles R. Frazier alone. The powers of the trustees in regard to selling the property and investing the proceeds thereof are not so limited in the trust deed of Marie Frazier as in the will of her father, Colin C. Frazier. In the father's will the trustees were not given any right to sell or dispose of the real property, and they were limited in the investment of proceeds from the personal property to loans on real estate security. In the Marie Frazier trust deed, however, the trustees were given power to invest and reinvest the proceeds of sale of both real and personal property ''in such property and securities as they shall deem best.''

In the Marie Frazier trust deed the trustees were given certain discretionary power in the investment of trust funds. The statement is often found that a trustee who is granted discretionary power owes a duty to the beneficiary in administering the trust to exercise such care and skill as a man of ordinary prudence would exercise in the management of his own property.

The court of chancery of Delaware in the case of *In re Cook's Trust Estate*, 20 Del. Ch. 123 (171 Atl. 730), after referring to the foregoing general rule as to the care required of a trustee, goes on to say that " 'such care and skill as a man of ordinary prudence would exercise in dealing with his own property' is not the standard he would use in dealing with his own property if he had only himself to consider; his 'duty rather is * * * to take such care as an ordinary prudent man would take if he were minded to make an investment for the benefit of other people for whom he felt morally

bound to provide.' In other words, he must take no risks which would not be taken by an ordinarily prudent man who is trustee of another person's property.''

The court there quotes with approval from *Mattocks v. Moulton*, 84 Me. 545 (24 Atl. 1004), as follows:

''He must always bear in mind that he is dealing with trust funds, which were * * * given him * * * to be guarded carefully and invested cautiously, so that principal, as well as interest, may be forthcoming at the appointed time. While he must be as diligent and painstaking in the management of the trust estate as the average prudent man is in managing his own estate, he may not always place the trust funds where he, or the average prudent man, would place his own funds. In measuring the duty of the trustee with the usual conduct of the man of average prudence in the care of his own estate, reference is to be had to the conduct of a man in making permanent investments of his savings outside of ordinary business risks, rather than to his conduct in taking business chances. There are often occurring good business chances in which a man may invest some of his own money without danger of being called imprudent, whatever the result. But it will be generally conceded that a mere business chance or prospect, however promising, is not a proper place for trust funds.''

The Delaware court surcharged the trustee's account with investments in bonds of an owner and operator of a New York office building, secured by a second mortgage, and in unsecured bonds of a utility company and of a company operating a chain of restaurants. The court, however, refused to surcharge the account with unsecured bonds of a railroad company, on the ground that such bonds were ''highly regarded at the time they were purchased'', and that they ''enjoyed the most favorable rating''.

In *United States National Bank & Trust Co. v. Sullivan*, 69 Fed. (2d) 412, the court states:

"If a trustee acts within his powers, good faith is a defense to a charge of mistaken judgment. If a trust provision gives the trustee wide powers of investment he may exercise his sound discretion within those limits, and his actions with respect thereto are not to be tested by considerations of what may be termed 'hindsight' judgment.

"In applying these principles to a grant of power to a trustee, such power must be construed in the light of other well established law governing the actions of trustees. Discretion to a trustee does not mean an arbitrary or unlimited or absolute discretion, but a reasonable one. He must use judgment and prudence, and if no limits are placed on his discretion, he must nevertheless invest the funds according to approved rules for trust investments. [Citing numerous authorities.] * * * Good faith alone will not protect a trustee, but he must also exercise diligence, prudence, and absolute fidelity."

 The care, skill and diligence which must be exercised by a trustee who is clothed with discretionary power is well described in the foregoing excerpts from the opinions of other courts. In addition to what has been said, it may further be stated that the criterion is not the degree of care which a particular trustee exercises in his own affairs of a like sort or in business matters generally. That he has speculated with his own funds instead of safeguarding the income and principal for the benefit of himself and his family does not prove that he measured up to the standard required of him as a trustee if he speculated with trust funds. "He would not satisfy the court by showing merely that prudence which a business man would exercise in trade or a speculation": 3 Bogert on Trusts and Trustees, § 541. There is also required of a trustee the utmost good faith. In determining whether a trustee has used sound discretion in the investment of funds entrusted to him, it is necessary for the court to place itself in the position

in which the trustee was at the time of making the investment: *United States National Bank & Trust Co. v. Sullivan*, supra.

It is a rule of almost universal application that a trustee who lends trust money without security therefor is to be regarded as not exercising sound discretion. Loans to individuals or corporations of trust money in return for only the note of the borrower are generally condemned: 1 Perry on Trusts and Trustees, 7th Ed., § 453; 3 Bogert on Trusts and Trustees, § 680; *Simmons v. Oliver*, 74 Wis. 633 (43 N. W. 561). And Oregon is in accord with the great weight of authority: *In re Roach's Estate*, 50 Or. 179 (92 P. 118); *Boehmer v. Silverstone*, 95 Or. 154 (174 P. 1176, 186 P. 26). In a few jurisdictions exceptions are made to this general rule when the loan is temporary and for a small amount: *Knowlton v. Bradley, Adm'r*, 17 N. H. 458 (43 Am. Dec. 609). Reasonable diligence must be exercised by the trustee to ascertain whether the security is adequate when it is accepted for loans.

The defendant made numerous loans out of the trust fund without taking any security whatever. In some instances the trial court charged the amount of the loan, with interest, to him personally. The Fag-O-San transaction was treated by all the parties concerned as a loan in its entirety, although a certificate for some shares of stock was issued in the individual name of the defendant. In making the loans to this company the defendant not only did not use sound discretion but apparently used no judgment at all. The loans by the defendant to his mother, Margaret E. Frazier, and to William E. Perry were unsecured and were properly charged by the court to the defendant personally. The loan to William A. Pomeroy has already been men-

tioned. In that instance adequate security was not taken for the money advanced. The real property on which the mortgage was given was not located in the state of Oregon, where the trust was being administered: *Cornet v. Cornet*, 269 Mo. 298 (190 S. W. 333); and the defendant did not have any personal knowledge concerning it or its value. The defendant should be personally charged with all these loans.

The Associated Gas and Electric debentures purchased by the defendant with trust funds were in effect nothing more than unsecured loans to the Associated Gas and Electric Corporation, made especially subject to senior obligations totaling $10,000,000. In addition to the fact that this investment was unsecured, there is the further objection that the defendant as trustee for the plaintiffs purchased the debentures from himself as guardian for his mother, at the same price that he had originally paid for them as such guardian, although when he bought them for the plaintiffs they could have been purchased at a much lower price in the open market. The law is well established that a trustee, even though acting in good faith, cannot invest trust funds in securities owned by himself in his individual capacity: *Lawndale National Bank v. Kaspar American State Bank*, 288 Ill. App. 555 (6 N. E. (2d) 670). In the instant case the defendant was personally interested in his mother's estate and it was to the benefit of that estate and of the defendant that a favorable price be obtained by him as his mother's guardian, in the sale of these debentures to the plaintiffs. For the reasons herein stated, the defendant should be personally charged with this investment.

With reference to the investment of trust funds in the stocks of private corporations, it is said in 1 Perry on Trusts and Trustees, 7th Ed., § 456:

"In the United States most courts do not sanction the investment of trust funds by a trustee in stock of private business corporations in the absence of permissive statute or authority in the instrument creating the trust. It is agreed, that trustees can not invest trust funds in trade, nor directly in manufacturing, nor in business generally, nor in personal securities, unless there is an authority contained in the instrument of trust. The reason is, that trustees can not use the trust fund in carrying on a private manufacturing establishment, nor in the business of private bankers, nor in underwriting, nor in trade and commerce, and that there is no difference in principle between carrying on such enterprises themselves with the trust fund, or lending it to other individuals to do so on their personal security, and buying shares or stocks in such business corporations carried on by other private individuals, or by the trustees themselves, as officers or agents."

We find in 3 Bogert on Trusts and Trustees, § 679, the same general rules announced. In the annotation in 12 A. L. R., beginning at page 574, it is stated that the courts are divided as to the right of a trustee to invest trust funds in the stock of private corporations, in the absence of a permissive statute or authority in the instrument creating the trust. A great many cases from a number of jurisdictions are cited, holding that such an investment is improper. Further on in the annotation it is pointed out that "according to other cases, a trustee may invest trust funds in the stock of corporations that have become established institutions the stock of which has a reasonably permanent value, where the investment is such as would meet the approval of prudent business men." The courts which hold to this latter rule are not nearly so numerous as those which hold that such investments are improper. In some of the jurisdictions which permit the investment of trust funds in the stock of going corporations the amount to

be used for such purpose is limited to a small proportion of the trust estate.

The question of the right of a trustee with discretionary powers to invest trust funds in corporate stock does not appear to have been directly passed upon heretofore in this jurisdiction, although this court did outline in general language, in the cases of *In re Roach's Estate*, supra, *Boehmer v. Silvestone*, supra, and *Hull v. Heimrich*, 138 Or. 117 (3 P. (2d) 758, 6 P. (2d) 41), the character of investments proper for trustees to make. In the opinion in *Hull v. Heimrich* the court quoted with approval the excerpts from Perry on Trusts and Trustees that we have last above quoted, as to the impropriety of purchase by trustees of stocks in private business corporations. The purchase by the defendant of stock in the Fag-O-San Company with trust funds, if any aspect of that transaction could be considered as a purchase of stock, his purchase of stock in Interstate Terminal Building Company and his oil stock investments would, under all the authorities, be classified as improper investments of trust funds. In making those purchases the trustee did not exercise sound discretion, and he should be charged personally with the amounts therefor expended by him.

Even though we concede that the defendant as trustee under the trust deed from Marie Frazier to him had certain discretionary power in investing funds of the trust estate, still he was required to "use judgment and prudence, and if no limits are placed on his discretion, he must nevertheless invest the funds according to approved rules for trust investments": *United States National Bank & Trust Co. v. Sullivan*, supra; *Cornet v. Cornet*, supra. The purchase of the above mentioned shares of stock was improper and can not be approved.

The only other matter regarding stocks that

we are called upon to consider is the purchase by the defendant of Corporate Trust shares and the later exchange of the said shares for stock in another investment corporation. These stocks or shares purchased by the defendant were not listed on any exchange and in reality amounted to nothing more than certificates of participation in a pool made up of stocks of numerous corporations. The management of such pools is in no way controlled by the owners of the certificates. The managing officers of the last mentioned investment trust may sell any of the shares making up the pool and substitute others. In purchasing certificates of shares in such investment trust the trustee is in effect delegating to other individuals or corporations his duties in the management of the estate as trustee: 79 Pennsylvania Law Review 266. Such an investment is, according to 3 Bogert on Trusts and Trustees, § 679, considered as undesirable for trustees to make.

In 1929 the legislature of this state authorized any person or corporation holding funds in a fiduciary capacity for charitable or educational purposes to invest the same in stocks of private corporations listed on the New York Stock Exchange, when such corporations have been in existence ten years and have during that time not defaulted in the payment of principal or interest on bonded debt, and when the stock of such companies has for five years next preceding such investment earned a sum in lawful dividends equal to at least 4 per cent on the par value of the stock: § 32-803, Oregon Code 1930. The legislature of 1925 in Laws 1925, chapter 207, § 106, specified the character of investments which might be made by trust companies. That section was subsequently amended several times and the law in its present state is found in § 22-1214, Oregon Code 1935 Supp. Neither in the original act

nor in the amendments thereof is any trust company given authority by the legislature to invest trust funds in the stock of any corporation. In the purchase of the Corporate Trust shares mentioned, the defendant did not select securities embraced within the description contained in the foregoing enactments. While those statutes do not apply to trustees of private trusts, they may be understood as indicative generally of the kinds of investment regarded by the legislature as safe and suitable for trust funds not specifically directed by the trust instrument to be otherwise invested. We do not consider the trustee's purchase of Corporate Trust certificates a proper investment for trust funds, and therefore the trustee is to be charged personally with the money expended for such certificates, together with interest thereon from the date of purchase, less the amount of dividends received from such shares by the trust estate.

▉ It is difficult for us to understand what actuated the defendant in the expenditure of trust funds on the Phoenix property. Before making any agreement with George Frazier, if they did have any definite understanding, the defendant should have investigated and ascertained the value of the Phoenix property and should have had a definite written contract with George Frazier as to the details of the agreement between them. Before spending any money on the property he should have gone still further and obtained a deed to the property which was to be transferred from George Frazier to the plaintiffs or their trustee. The least that can be said of the defendant in reference to this transaction is that he did not use due care and diligence and should be charged with the expenditures made by him in connection with the Phoenix property, with interest added. From the record before us we can not say that the de-

fendant ought to be charged with the amount of the note given by George Frazier to his sister, Marie, which note, according to George Frazier, was to be canceled in the settlement of the Phoenix property.

In the light of the facts of this case we are of the opinion that the defendant should be charged interest at the rate of 6 per cent per annum on all the items which by this opinion or by the trial court are charged to his account: 4 Bogert on Trusts and Trustees, § 863; 37 A. L. R. 447, annotation. He should, however, be credited with any interest which he has received on account of any of said items, and paid into the trust fund. He should also be credited, if this has not already been done, with the interest paid on the Parker & Banfield notes.

In preparing data for the decree the accountant for the defendant computed interest at the rate of 6 per cent per annum and it was assumed by the trial court that 6 per cent was the proper rate to be applied where interest was to be charged.

The circuit court allowed the defendant $10,000 for compensation as trustee. From this amount, however, there was deducted the sum of $443.65, which had been paid to the defendant since April 1, 1918.

Beginning with 1915 and continuing through 1920 the defendant has computed his compensation on the basis of 5 per cent of the gross income of the estate received by him. For the years prior to 1915 he charged a flat fee, ranging from $25 to $100 a year. In 1921 and 1922 he charged the estate a flat fee of $75 for the previous year's services. The gross income of the estate received by the defendant as trustee from April 1, 1918, to June 30, 1934, amounted to $50,442.92, and the net proceeds distributed to the beneficiaries were approximately $33,000.

It was stipulated at the trial of the case that during the past few years, next preceding the trial, trust companies generally charged one-half of 1 per cent of the corpus of the estate, for their services, and that theretofore the charge had generally been 5 per cent of the net income of the trust estate. The amount to be allowed the defendant, if any, as such compensation, was left to be decided by the court. We are of the opinion, because of the fact that the trust estate in this instance included a farm in eastern Oregon and certain real property in Portland to be managed by the trustee, his compensation from April 1, 1918, to June 30, 1934, should be 5 per cent of the gross income, or $2,522.15, from which is to be deducted the $443.65 which he has heretofore been paid. Because of the lack of proper bookkeeping, it is impossible to determine the value of the corpus of the estate during the period between 1918 and 1934. We are therefore using as a basis of compensation the gross income for that period. The amount of compensation to be allowed a trustee for his services depends to a large extent on the particular facts in each case: 4 Bogert on Trusts and Trustees, § 979. The amount above designated as proper compensation does not cover the period since June 30, 1934, and payment to the trustee for his services since that date should be fixed by the circuit court, but no provision should be made for extra fees for his services in connection with this litigation. It is to be understood that any allowance made the defendant as compensation for his services is to be treated as a credit on his account with the plaintiffs, and not as a direction for payment to him in cash.

The circuit court allowed the defendant $750 as attorney's fees for the trial of this case, to be paid out of the trust fund. He was unsuccessful in resisting the

beneficiaries' effort to surcharge his account with large sums of money and we think therefore that the defendant should not have been allowed any attorney's fees at all: *In re Will of Shirley H. Drake,* 195 Minn. 464 (263 N. W. 439, 101 A. L. R. 801).

▉ The trial court saw fit to continue the defendant as trustee of the estate. The complaint alleges that he has expressly asked to be relieved of the obligations of his trust and permitted to resign as trustee, and in his answer the defendant has stated such a desire. We think that it would be best for all concerned that he resign and that some other individual or a corporation be named as trustee. The defendant, however, should be given a reasonable time, before being required to resign, in which to put his accounts in order.

The decree of the trial court is modified in accordance with what has hereinabove been said, and the cause is remanded with directions to the circuit court to take such further proceedings as may be necessary to settle the accounts between the litigants, and to enter a proper decree. The plaintiffs will recover costs in both this and the circuit court.

BEAN, C. J., and LUSK, J., concur.

RAND, J., not participating in this opinion.

---

Petition for rehearing denied July 12, 1938

ON PETITION FOR REHEARING
(81 P. (2d) 132)

BAILEY, J. The respondent, Charles R. Frazier, has filed a petition for a rehearing in this case, in which he urges further consideration of some of the matters discussed in our former opinion and other matters which were not therein specifically mentioned.

George W. Frazier, cousin of the respondent and uncle of the appellants, was guardian of the appellants during the years 1919 to 1931, in which period there was paid to him as guardian, by the respondent as trustee for the appellants, money in excess of $25,000. According to the report of the accountants and the books prepared by the accountants for the respondent, this sum included the total which George Frazier as such guardian received from the trustee.

In explaining the transactions involving the Phoenix property, the respondent in his principal brief called attention to the fact that George Frazier was guardian of the appellants during the time that the respondent paid out money for taxes, liens and other purposes in connection with the Phoenix property, and it was argued that since George Frazier was such guardian during that time the expenditure by the trustee should be considered as payment by the trustee to the guardian, thereby relieving the trustee from any responsibility for money so expended. This point is again raised in the petition for rehearing. There is no merit in the respondent's contention. In the first place, the only money which could be said to have been paid to George Frazier with reference to the Phoenix property was approximately $185 as the cost of his trip to Phoenix and return. The balance of the money was paid direct by the respondent, not through the guardian, to the city for liens and the county for taxes and to the Phoenix attorneys who were retained to probate the estates of Colin C. Frazier and Matilda Frazier, his wife, both deceased. Much of the money so expended was not from the net income, but from the principal, of the Marie Frazier Marshall trust estate.

The respondent's duty was to pay the net income of the estate to the guardian. He had no authority to

pay to the guardian any part of the corpus of the trust. Moreover, the appellants could not require George Frazier, as their guardian, to account for the money which was disbursed by the respondent for the Phoenix property, inasmuch as such money never came into the possession of George Frazier as guardian.

In our former opinion we stated that the respondent's account should be surcharged with certain items and that he should also be charged with interest thereon at the rate of six per cent per annum from specified dates. The reason that we allowed interest was that in many instances the respondent appeared not to have remembered that he was acting as trustee of the funds in his charge and to have used such funds as though they were his own.

We did not intend, when in our former opinion we referred to the respondent's willingness to cooperate with the accountants in the preparation of their reports, to imply that the trustee had acted in good faith in making the investments with which his account is surcharged.

Further, in stating that six per cent per annum is a proper rate of interest to be charged the respondent, our opinion is not to be interpreted as laying down the rule that in all instances of surcharging a trustee's account the beneficiaries are entitled to interest. Whether interest shall be charged a trustee depends upon the peculiar facts of each case. The legal rate of interest in this state is six per cent per annum, and, as held in many jurisdictions, when interest is allowed against the trustee it is to be charged at the legal rate, unless the facts warrant a higher rate or justify a lower one: Annotation, 37 A. L. R. 447.

In the present instance there are no extenuating circumstances which a court of equity would regard as grounds for relieving the trustee from the payment of interest or for reducing the amount thereof below the legal rate. He kept no books or accounts showing his handling of the trust fund. He used trust moneys in various business concerns in which he was financially interested, because it was easier, he stated, to borrow money from the trust fund than from banks. For the same reason, he bought automobiles for his mother out of the trust fund and from that fund made loans to her and to his friends and associates. In purchasing shares of stock in various corporations he took certificates therefor in his own name and not as trustee.

In March, 1909, the respondent as trustee of the Colin C. Frazier estate filed his final account in the county court for Union county, relative to the personal property of the said estate. In that report he charged compensation for his services as trustee, which the county court allowed him. Thereafter each year he charged the Colin C. Frazier trust estate until 1918, and the Marie Frazier Marshall trust estate until 1922, compensation for the services performed by him during the preceding year. From 1922 on, the trustee failed to charge against the trust fund an annual fee for his services.

It was in 1923 that the respondent began to invest the trust moneys in the stock of oil companies and other concerns and to take the stock certificates in his own name. After investing the moneys in this manner and making the many loans to which we referred in our former opinion, he seems not to have charged compensation for his services. Apparently he was under the impression that he could not use the money in the

manner that he did, and at the same time charge the *cestuis que trustent* a fee for managing their funds.

The net income of the trust estate from 1918 to 1934, when the audit was made, totaled $33,723.71, and for his services during that period the circuit court allowed the trustee $10,000 as compensation, which was approximately 30 per cent of the net income. It is now insisted by the respondent that this court, in reducing the amount of his compensation to 5 per cent of the gross income during that period, ignored the stipulation of the parties to the effect that the trial court might, if it found the respondent entitled to any compensation for his services, determine the amount to which he was entitled. There was no expert testimony as to the value of the respondent's services, but there was a stipulation, referred to in our former opinion, as to the fees charged by trust companies. We do not understand from that stipulation as to the court's fixing the trustee's compensation that the parties to the litigation agreed to be bound by whatever amount the trial judge might determine, and thereby barred themselves from questioning the amount thereof on appeal.

In 26 R. C. L., Trusts, page 1392, § 258, it is said:

"The question of what is a reasonable compensation for trustees depends largely on the circumstances of each particular case, and can not be properly determined by any inflexible rule. While in practice it is usually claimed and awarded in the form of a commission, the rate is not usually determined by any established rule. The general rule running through all of the cases is that a trustee should receive a compensation adequate to his care and trouble. Such compensation is proportioned to responsibility incurred and to the labor and care bestowed. A trustee's compensation may be increased, diminished, or withheld altogether, accord-

ing to the circumstances of each case, in the sound discretion of the court. If the transactions of the trust are involved in obscurity, which might have been removed by the trustee by a proper attention to duty, his compensation should be put at the lowest estimate.''

We are of the opinion that in view of the facts in this case the allowance which we made to the trustee as compensation for his services was indeed adequate.

▇▇▇ In our former opinion we charged the respondent individually with $3,000 as the balance unaccounted for by him on the William Webster mortgage as of January 7, 1924, the date on which the respondent satisfied that mortgage of record. It is now argued that January 7, 1924, is a date which this court arbitrarily fixed as the one from which the respondent should be charged interest. It may be possible that the respondent received the $3,000 prior to that date. Yet since the record is silent on this subject it must be presumed that he had received the balance of the purchase money mortgage on or before January 7, 1924. Otherwise, the mortgage would not on that date have been satisfied.

This $3,000 was not deposited in the trust account, and the only money repaid by the Crescent Paper Company, as far as the record shows, was that which had been loaned to it by the trustee out of the trust account. Therefore, there is no basis for claiming that the $3,000 was part of the trust fund loaned to the paper company and repaid by it to the trustee. Nor can it be said that our former opinion had the effect of charging both the paper company and the trustee interest on this $3,000 at the same time. The only interest paid by the paper company was on money loaned to it that has been accounted for as definitely a part of the trust fund.

The first purchase of 500 shares of Corporate Trust shares by the respondent was made May 8, 1930, and the remaining 500 shares on June 11 of the same year. Section 32-803, Oregon Code 1930, to which we referred in our former opinion, was a part of chapter 384, Laws 1929. Therefore § 32-804, which is a part of the same 1929 enactment and provides that nothing contained in the act "shall be construed to affect the validity of investments heretofore made of funds of the character described in the preceding section hereof", does not aid the respondent in any way in his contention that the legislature did not intend by this enactment to affect prior investments, inasmuch as the Corporate Trust shares were purchased long subsequent to the effective date of this statute. Moreover, we did not say or intend it to be understood that the act above referred to was in any way controlling in the investment of trust funds by individual trustees, but only that it and other statutes to which we referred were indicative generally of the kind of investment regarded by the legislature as safe and suitable for trust funds.

The respondent asserts that Mr. Schumann, an uncle of the plaintiffs, had advised him to buy the Corporate Trust shares, and Mr. Schumann, who was called as a witness for the respondent, confirmed this statement, saying that he had vouched for the soundness of this investment. The same witness stated that he was a securities salesman and had sold Corporate Trust shares for many years. After he had stated that Ross, Beeson & Company had put Corporate Trust shares on the market, Mr. Schumann was asked if he had advised his clients to exchange Corporate Trust shares for Quarterly Income shares, which also originated with Ross, Beeson & Company. He answered that question

in the negative, and was asked, "Why not?" He thus explained:

"Well, that is purely a matter of personalities, I think. I became quite disgusted with the Ross, Beeson management. These shares that the boys bought were what we called the original Corporate Trust shares. After that Beeson came out with two other series and endeavored to trade people—each time they came out with a new one—and endeavored to trade them out of the old one with the new one, which meant an additional loading charge for the people, although they didn't know it, and he went through that two or three times, and it had all the earmarks of a racket as far as I was concerned and I just refused to change any of the Corporate Trust shares. Well, his subsequent actions justified me in my conclusions, I think, and he has gone from Quarterly, now, he has gone into a new one called Maryland Fund, and they are continually switching and switching and switching, and it was because of the racketeering tendencies that I quit selling Corporate Trust shares and advise[d] people not to exchange them when they would get these letters from various companies."

Without reiterating what was said in our former opinion we hold that the purchase by the respondent, first of Corporate Trust shares and later of Quartely Income shares, was an improper investment of trust funds.

We have given the respondent's petition for rehearing careful consideration and are of the opinion that the same should be denied. It is so ordered.

BEAN, C. J., and LUSK and RAND, JJ., concur.