**REES, Estate of, In Re.**

Probate Court, Cuyahoga County.

No. 56362.   Decided June 22, 1947.

514

McAfee, Grossman, Hanning, Newcomer & Hazlett, Cleveland, for exceptors.

Baker, Hostetler & Patterson, Cleveland, for trustee.

## OPINION

By BREWER, J.

This cause came on to be heard on the exceptions filed on October 16, 1939, on the first amended exceptions filed on October 27, 1944, and on the second amended exceptions filed on April 18, 1946 to the 14th partial account, and to all of the previous thirteen partial accounts filed by The Cleveland Trust Company as testamentary trustee appointed under the last will and testament of William D. Rees, deceased.

William D. Rees died a resident of the City of Cleveland on or about the 5th day of July, 1910. The Cleveland Trust Company qualified as trustee on the 2nd day of July, 1911, and has acted in that capacity since that time.

These exceptions were filed on behalf of H. Maynard Rees and Marian Rees Hutchins, son and daughter of William D. Rees, who are the life beneficiaries, and on behalf of the four minor grandchildren of William D. Rees, deceased, namely, Henry Maynard Rees, Jr., Homer McKeehan Rees, Morgan Van Allen Rees, and Elihu Pugsley Rees, children of H. Maynard Rees. All of the minors are non-residents and are represented

in this suit by William A. McAfee, the duly appointed, qualified and acting guardian of their Ohio estates.

The exceptions filed were as follows:

No. 1 relates to investment in participation of $20,000 in Estates Holding Company mortgage. This exception has been withdrawn by exceptors.

No. 2 relates to investment in participation of $25,000.00 in the Opera House Fee land trust certificates. This exception was withdrawn by exceptors.

No. 3 referred to as Exception No. 1 in second amended exceptions, relates to investment in participation of $76,000.00 in the Higbee Fee land trust certificates.

No. 4 referred to as Exception No. 2 in second amended exceptions, relates to investment in participation of $50,000.00 in Bolton Fee land trust certificates.

No. 5 referred to as Exception No. 3 in second amended exceptions, relates to investment in participation of $2,000.00 in the Kimball Fee land trust certificates.

No. 6 referred to as Exception No. 4 in second amended exceptions, relates to investment of $26,000.00 par value Bankers Joint Stock Land Bank of Milwaukee Bonds.

No. 7 relates to investment of $20,000.00 par value Des Moines Joint Stock Land Bank bonds. This exception was withdrawn by exceptors.

No. 8 relates to investment of $16,000.00 par value Liberty Central Joint Stock Land Bank bonds. This exception was withdrawn by exceptors.

No. 9 relates to the retention of 636 shares of Cleveland Trust Company stock received from the testator, and to the retention of shares received subsequently as a stock dividend, and to the exercise subsequently of the rights to subscribe to additional shares and the retention thereof. This exception was withdrawn by exceptors.

No. 10 referred to as Exception No. 6 in second amended exceptions, relates to the retention of Union Trust Company stock and to prior retention of stock in banks which were merged with the Union Trust Company. This exception was withdrawn by exceptors.

No. 11 referred to as Exception No. 7 in second amended exceptions, relates to the exercise of rights to acquire stock of the Union-Cleveland Corporation in the amount of $9,640.00.

No. 12 relates to the retention of Kelley Island stock received from the testator. This exception was withdrawn by the exceptors.

No. 13 relates to the receipt and retention of Cleveland Railway stock, and excepted to the exercise of rights to acquire

additional shares. This exception was withdrawn by exceptors.

No. 14 referred to as exception No. 8 in the second amended exceptions, relates to the investment of $25,625.00 in the purchase of 250 shares of Continental Shares, Inc., preferred.

No. 15 referred to as exception No. 9 in second amended exceptions, relates to the investment of $33,446.50 in 902 shares of common stock of Continental Shares, Inc.

No. C referred to as exception No. 10 in second amended exceptions, relates to the compensation taken by the trustee from the inception of the trust.

No. 5 in the second amended exceptions relates to the lack of diversification in general. This exception was withdrawn by exceptors.

The only exceptions remaining, using numerical designations as referred to in exceptors' second amended exceptions, are No. 1, pertaining to Higbee land trust certificates, No. 2, pertaining to Bolton land trust certificates, No. 3, pertaining to Kimball land trust certificates, No. 4, pertaining to the investment in Bankers Joint Stock Land Bank of Milwaukee bonds: No. 7, pertaining to the investment of stock of Union-Cleveland Corporation; Exception No. 8, pertaining to purchase of preferred stock in Continental Shares, Inc.; No. 9, pertaining to purchase of common stock in Continental Shares, Inc., and No. 10, pertaining to disallowance of trustee's compensation.

In the last will and testament of William D. Rees, deceased, The Cleveland Trust Company, as trustee, was given certain powers relative to investments, as follows:

"To hold, manage and control for the objects and purposes hereinafter expressed, with authority to sell and dispose of all or any part thereof, either together or in parcels, at such price and upon such terms and conditions, and in such manner in all respects as it shall deem advisable; and for such purposes to execute all deeds, conveyances, assurances and instruments as it may deem proper, as fully and with like effect as I could, if living.

"I further confer upon said trustee authority to invest proceeds arising from the sale of said property in government, state or municipal securities, or in such other stocks, mortgage loans or securities as it may deem for the best interest of my estate, giving to said trustee absolute discretion as to the price, terms, conditions, rate of interest and yield in respect to such loans and investments and authority to vary or transpose the same into others of like or similar nature, deemed suitable for the investment of trust funds. Said

trustee shall not be obliged to convert any stock or securities which I may own at the time of my decease into other securities, but may, at its option, retain the same without liability upon its part for depreciation or loss."

The investment powers granted to the trustee were subject to the following provision:

"Up to July 1, 1918, all investments shall be made with the written approval of my wife, Cornelia M. Rees, if living; after said date, all investments shall be made with the written approval of my son, Henry Maynard Rees, during his life."

Cornelia M. Rees lived beyond July 1, 1918, at which time H. Maynard Rees succeeded her. He was then about twenty-seven years of age.

The court will now consider the exceptions in the order herein above set forth in second amended exceptions.

Although the court will discuss individually the exceptions to the investment in land trust certificates of the Higbee Fee (Exception No. 1), the Bolton Fee (Exception No. 2) and the Kimball Fee (Exception No. 3), the position taken by the exceptors to all three of the exceptions in general is

(a) Investments in land trust certificates were not authorized under the testator's will.

(b) The transactions involved breaches of the trustee's duty of undivided loyalty, in that the trustee having purchased the certificates from itself, was guilty of self-dealing.

### EXCEPTION NO. 1—HIGBEE FEE

Exceptors contend that the investment powers of the trustee as herein before quoted did not grant to the trustee the right to invest in real estate, and, therefore, no right is granted to invest in land trust certificates, and exceptors further contend that land trust certificates were not known as a form of investment when the will was executed, and that, therefore, the words used by the testator could not have intended to grant to the trustee authority to invest in land trust certificates.

The trustee, on the other hand, contends that the trustee's power to make investments was not limited to "government, state, or municipal securities, or in such other stocks, mortgage loans or securities as it may deem for the best interest of my estate." The trustee emphasizes that the testator supplemented the right to make the foregoing specific investments by granting "authority to vary or transpose the same

into others of like or similar nature deemed suitable for the investment of trust funds".

The trustee maintains that the will gave it power to buy land trust certificates, relying for its authority on the interpretation of the word "securities", and on the similarity of land trust certificates to "stocks, mortgage loans or securities".

Obviously, land trust certificates are not "government, state or municipal securities". Are they then "stocks, mortgage loans or securities", or "of like or similar nature" to "stocks, mortgage loans or securities", so as to give the trustee the authority within the terms of the last will and testament of William D. Rees to invest in land trust certificates?

Exceptors cite from Page on Wills, Section 918-919, as the authority for the general principle that it is elementary that in construing a will the sole purpose is to ascertain the intention of the testator, as evidenced by the language he had. used in his will. To this proposition the court subscribes. Section 919 provides in part:

"As the courts are careful to discover and enforce testator's. intention, but not to make a new will for testator, it follows that they constantly refuse to ascertain testator's intention except from the words which he used in his will, together with. such extrinsic evidence as is admissible. The question always: before the mind of the court is, not what should testator have meant to do, or what words did he mean to use, but what is the reasonable meaning of words which he has actually used."

Recently, Judge Matthews of the Court of Appeals of Clermont County, had the following to say regarding the intention of the testator in **Speidel v. Haller, 44 Abs 52, 69 N. E. 2d 81.**

"In reaching this conclusion, we do show by the application of the one cardinal principle that in construing a will a court should place itself in the position of the testator, and, as far as humanly possible, think as he or she thought, and, if by so doing, the intent becomes clear, that intent should be given effect and no artificial or legalistic rule, appropriate when the intent is not clear, should be allowed to defeat the clear intent." **Provident Sav. Bank & Trust Co. v Volhard, 54 Oh Ap 327, p. 329, 7 N. E. 2d 234, 41 O. Jur. 575, et seq., and 590 et seq., and 608.**

The court must concern itself specifically with the interpretation of the word "securities", in order to determine whether or not in the general powers given the trustee,

"securities" were to include land trust certificates, giving due weight to the intention of the testator.

The Court, in Fidelity Union Trust Co. v. Lowy, 123 N. J. Eq. 90 in interpreting the word "securities" found:

"Syl. 1. The word 'securities' in its broadest sense, and as understood in modern usage, includes stock, both common and preferred.

"Syl. 2. As used in a will, it will be given that interpretation which will most completely carry out the intention of the testator.

"Syl. 3. Where a will authorizes the executor and trustee to retain, or to reinvest in, non-legal 'securities', the word 'securities' will be interpreted according to **modern usage**; but without such authorization it will be construed in its restricted sense and as exclusive of all investment not authorized by statute."

In 1942 the Supreme Court of Delaware, 24 Atl. 2d 327, in reversing Trustees v. Equitable Trust Co., 17 Atl. 2d 13, holding that mineral deeds and sale of oil and gas royalties passed under the provision of the will, interpreted the word 'securities' as follows:

"It may be presumed, in the absence of anything to the contrary, that the testator was accustomed to use and to comprehend words as would a person of average intelligence and business understanding. In the ordinary lay mind the instruments in question are 'securities'; and putting aside formalism and looking to the essential verities they are securities. * * *"

The Supreme Court, referring to **In re Estate of Binder, 137 Oh St 26**, which concerned only land trust certificates, states on **page 302** of **In re Estate of Stone, 138 Oh St 293**:

"In the Binder case the general rule is laid down that a trustee violates his duty of loyalty if he buys securities. * * *"

Thus, the Supreme Court's use of the word "securities" in referring to land trust certificates is obviously interpreting this word according to modern usage in using it in its ordinary, everyday and unrestricted meaning.

H. Maynard Rees, one of the exceptors, likewise applied it in modern usage, stating in a letter dated March 17, 1924:

"I am loathe to allow a dollar of the real estate participation fees to get out of the estate and would prefer it if you would find some other **security** to dispose of."

The decedent's will made no attempt to define or limit the scope of the word "securities". This court cannot hold in the case at bar that "securities" should be restricted to the forms of investments known at the time the will was made. However, if this court had entertained any doubt as to the scope of the word "securities", such uncertainty would be outweighed by the further rights given the trustee by the provisions:

"And the authority to vary or transpose the same into others of like or similar nature deemed suitable for the investment of trust funds."

The testator must have intended to grant the trustee broader investment powers by this added provision, for certainly these words were intended to confer added discretion in the trustee as to what investments are "of like or similar nature". It appears to this court that land trust certificates are "of a like or similar nature" to "mortgage loans".

H. Maynard Rees, one of the exceptors, who had the power of approval, in a letter dated December 30, 1923, said:

"Wherein these participations differ from mortgages or bonds secured by real estate is beyond me."

This court is of the opinion that land trust certificates are of like or similar nature to mortgages and the word "securities" should be construed to be broad enough to include land trust certificates, and that the trustee under this will had the authority to invest in land trust certificates.

We come now to the question whether, in the purchase of the land trust certificates by the trustee, there was any evidence of self-dealing in violation of the rule of undivided loyalty.

The exceptors showed by the bookkeeping records of the banking department and by the testimony of the comptroller, who was called as their witness, that the funds of the bank were initially used to acquire these land trust certificates. The trustee, on the other hand, offered evidence to prove that the use of the bank funds in the first instance to acquire these land trust certificates was merely an incident in the mechanics of acquiring them and temporarily carrying them for the benefit of the trusts administered by its trust depart-

ment. The trustee also maintained that the evidence discloses that the minutes of the board of directors authorized the purchase of these certificates as an investment for trust funds and not as an investment for bank funds.

The trustee further contends that the bank received and retained only the equivalent of interest on its funds so used until the time the trust acquired the investment.

We must look to the evidence, therefore, for our conclusion. The evidence discloses that the Rees trust acquired Higbee land trust certificates aggregating $76,000.00, as follows:

| $70,000.00 | June 1, 1922 |
| 3,000.00 | June 19, 1922 |
| 1,000.00 | October 9, 1922 |
| 2,000.00 | November 16, 1922 |

The evidence further discloses that this land trust certificate issue was created by the trustee on June 1, 1922. The Rees trust paid for $70,000.00 of these certificates on the same date.

The record discloses that the second purchase of $3,000.00 of these land trust certificates was made on June 19, 1922 out of a block of $100,000.00 which became available on June 16, 1922.

The record discloses that the third purchase of $1,000.00 of these land trust certificates was made on October 9, 1922 out of another block of $100,000.00, which became available on October 2, 1922.

The record discloses that the fourth purchase of $2,000.00 of these land trust certificates was made on November 16, 1922 out of a further block of $100,000.00, which became available on November 1, 1922.

But the trustee and exceptors place considerable reliance on the opinions of the Supreme Court in In re Estate of Binder, supra, and In re Estate of Stone, supra, in support of their contentions.

The trustee in the Binder case was a large trust company managing many trusts. The trust instrument carried broad investment powers. In all such investment transactions before the court, the question involved was "self-dealing". Without discussing the facts in each transaction complained of, it is sufficient to say that in five of the transactions the court found the trustee guilty of self dealing and innocent in two. In substance, the court laid down these principles:

1. That the transfer of securities not infected by breach of trust at their inception by one who is a trustee of more than one trust from one of the trusts to another, if done in good faith, is permissible in Ohio.

2. That a trustee may set up an independent trust in property other than its own and issue land trust certificates to the various trusts of which it is a trustee.

3. That a trustee may advance money to purchase securities for a trust, provided such securities are immediately allocated.

4. That a trustee may not invest trust money in securities in which it is interested and may not buy or sell trust property, thereby gaining for itself a profit.

5. That Departmental Banks are single corporate entities; therefore transactions between the separate departments constitute self-dealing which is not excused by broad terms in the instrument.

In the Stone case, supra, self-dealing was also involved in the litigation. The Supreme Court reaffirmed its position in the Binder case, supra, on certain issues in which the cases were similar, and announced these findings of additional principles arising out of the different circumstances not found in the Binder case, supra. These additional findings were, in substance:

1. That a trustee commits an act of disloyalty when it makes purchases for the trust of certificates of participation in a mortgage trust fund which consists of mortgages individually owned by it as mortgagee, plus others held by it as trustee.

2. That a corporate trustee may not acquire or retain its own shares in trust unless specifically authorized by the instrument or a provision of law.

3. That to bind a beneficiary of a trust he must not only be aware of all the material facts, but must also be advised of his legal rights.

The second pronouncement in the Stone case, supra, is not material to the question of the purchase of the Higbee land trust certificates.

In the opinion of this court, using the Binder case, supra, as a yardstick, none of the principles announced therein would warrant a finding of self-dealing in violation of the rule of undivided loyalty in regard to the original purchase of $70,000.00 Higbee land trust certificates made by the Rees trust on June 1, 1922, the same day that the issue was created by the trustee.

Our attention must be directed to the remaining $6,000.00 Higbee land trust certificates. Exceptors contend that the use of bank funds to carry these $6,000.00 certificates until paid for by the Rees trust, and the retention by the bank of the equivalent of interest on such funds, constitutes self-dealing in violation of the duty of undivided loyalty.

The evidence discloses that a period of some three to fifteen days elapsed between the time that they were acquired by The Cleveland Trust Company and acquired by the Rees trust.

The exceptors place considerable reliance upon the word "immediately" as used in the syllabus in the Binder case, supra. The exceptors in support of their contention maintain that the word "immediate" as used in the Binder case, supra, must be construed to be related to "instantaneous". The trustee, on the other hand, believes that the facts in the Binder case, supra, must lead to the conclusion that the word "immediate" must be interpreted in the light of the surrounding circumstances. Moreover, the trustee contends that the overruling by the court of the exception relative to the Fort Hayes Hotel land trust certificates, discloses that the Supreme Court did not use the word "immediately" in the sense of instantaneous.

The record in the Binder case, supra, discloses that the Fort Haynes Hotel transaction was consummated on April 25, 1924, and that the transfer and allocation was not made to the Backus trust until May 19, 1924, subsequent to which time these land trust certificates were acquired by the Binder trust from the Backus trust.

The trust instrument provided an annual fee of $360.00 for the payment of services for the trustee of the land trust. The bank received expenses and an acceptance fee aggregating $9,456.92.

This transaction, which was affirmed by the court, nullifies the contention that immediate transfer is necessary, for it seems to follow logically that if the Backus trust owned Fort Hayes Hotel land trust certificates which were infected with self-dealing because they had been held for some twenty days, the same disability would follow the same certificates into the Binder trust.

The Supreme Court says, relative to the Fort Hayes land trust certificates, page 49, Binder case, supra:

"Here there was no self-dealing in or ownership of the certificates in question on the part of the bank. For reasons already given, since the record does not disclose that the bank had any interest in the property, that the price paid was unreasonable, that the mortgage assumed was in distress, or that the acceptance fee for the organization of the trust or the annual fee for its management was excessive, no successful attack can be made on the legality of the transaction."

That "immediate" distribution is not necessary, would appear further in the Binder case, supra, where the Supreme Court cites from **Scott on Trusts**, page 36:

"* * * It would seem, however, that if the investment is, otherwise proper, the mere fact that the trustee advanced its; own money in the first place but acquired the mortgages for the purpose of distributing them among the trust estates, administered by it and where only **a short interval elapses, between the purchase and the distribution,** there is no such, self-dealing as to make the transaction improper. * * *"

And, continuing on page 37,

"* * * The appropriate method of creating such a record is; by written resolution of the trustee board providing for such. purchase and allocation to the several trusts, **but other record evidence doubtless is sufficient if it is actually made in due course of business and** clearly discloses the nature of the transactions. * * *"

Recently, the Court of Appeals, in New York, in Marcellius v. The First Trust and Deposit Co., 291 N. Y. 372, in which the Court surcharged the trustee, in discussing self-dealing relative to retention by the bank, had this to say, on page 374:

"The trustee urges that the rule against self-dealing does not apply to an investment of trust funds in securities which a trust company purchases and holds for the purpose of transfer of a trust fund when the monies in the trust fund become available for investment. **That question is not presented by this record and may not be considered by us. There is no evidence here that the mortgage purchased by the Trust Company more than a year before it was transferred to the trust fund was acquired by the trust company solely for such purposes or was held in a suspense account or was otherwise earmarked for ultimate transfer to a trust fund.** * * *"

Subsequently, in Smith Estate, 65 N. Y. S. 2d 457, the Surrogate Court of New York County, on September 13, 1946, also concerned with the question of self-dealing, distinguishes the facts before it from the Marcellius case, supra, by holding as follows:

"The first fundamental objection is that the trustee was. guilty of self-dealing in allocating to this estate a participation in a mortgage acquired by the trustee with its own funds.

and taken originally in its own name. The whole mortgage in which a participation was allocated to the estate of the deceased was acquired by the trustee on June 2, 1931 and **six days later** the allocation of a share in it was made to the trust. The question is whether such allocation constituted self-dealing.

"The comments of this court in the matter of Dalsimer's estate, 160 Misc. 902, 291 N. Y. S. 34, are pertinent. There the court said in substance that if a corporate fiduciary temporarily uses its own funds to acquire mortgage investments so as to have on hand mortgages suitable for trust investment, it would not be held to be guilty of self-dealing provided the instrument was held in a suspense account and provided it was shown that the purpose of it was to have the asset available for the speedy investment of trust funds. That rule for trust administration has been applied in this Court in other instances. It appears to have been called to the attention of the Court of Appeals in Marcellius v. First Trust and Deposit Co. 291 N. Y. 372, 52 N. E. 2d 907. The comments of that court * * * indicate that the issue is there still open because the court there said that the **question was not presented on the record in the cited case.** There seems to the Court no reason to depart from the rule in the matter of Dalsimer Estate, supra, so the objection to the investment which charges self-dealing is overruled on the merits."

After reading the record in the Binder case, supra, concerning the Fort Hayes Hotel transaction, and considering the distinction made in the last New York case cited, there is little room for doubt that the question of self-dealing is not based entirely upon the mechanical delivery to the trust estate, but is based upon a consideration of the evidence. Each case must rest on its own "peculiar facts", as mentioned in exceptors' reply brief, or, as stated by the Court of Appeals in **Estate of Stafford, 46 Abs, page 260:**

"No reason appears for extending the conclusions announced in the Binder and Stone cases to situations not covered by the facts furnishing a setting for such decisions."

Reference has been made by the exceptors to the income which the bank received on the $6,000.00 certificates during the time they were held. The record discloses that the bank received no more income than was earned on these certificates for the period they were held for the Rees trust.

526

In Bank v. Basham, 191 Southern 873, cited in the Binder case, supra, the court found:

"The insistence that the collection from trust estates of interest on loans for the time they were carried by the bank should be penalized as self-dealing is untenable. This merely meant that the trustee took the loans at their present value. **By what line of reasoning should the trusts receive this un-earned increment, rather than the bank, who had earned it in carrying the loans in aid of the trusts?** * * *"

This court must concur in this finding, for, to hold other-wise would mean that the Rees trust would have received income on funds not yet invested. In the opinion of this court, the evidence discloses that the real estate upon which the Higbee issue had been based was not the property of the Bank; that the real estate was acquired for the investment of trust funds; and that the trustee did not make any profit on the issue. It is the further opinion of this court that neither the carrying of that investment temporarily by the bank, nor its receipt of interest for the use of the funds advanced, justifies a finding that the trustee was guilty of self-dealing.

Exception No. 1 is not well taken, and is, therefore, overruled.

### EXCEPTION NO. 2—BOLTON FEE

Exceptors claim here that the investment of $50,000.00 in so-called Bolton land trust certificates was not authorized under the will. and that the Trustee was guilty of self-dealing in making this investment. The evidence discloses the fact that this property was acquired on November 30, 1923, pur-suant to authority granted by the board of directors of the trustee to make this investment for trust funds. Prior to that date, the trustee had suggested in a letter addressed to H. Maynard Rees, whose approval was required for all invest-ments, that the Rees trust invest $45,000.00 in these land trust certificates. H. Maynard Rees, the advisor, immediately ap-proved of this recommendation. It seems to this court that this constituted a full and complete allocation even before the transaction had been completed. Following this approval of the investment by H. Maynard Rees, the advisor, consider-able correspondence passed between him and the trustee as the result of the trustee reconsidering the question as to whether or not the investment powers were broad enough to include the purchase of land trust certificates. The advisor, H. Maynard Rees, urging the trustee to make the investment, said in his letter of December 30, 1923:

"* * * I therefore desire of the Cleveland Trust Co. that they take as broad a view of the matter as possible, considering the obvious needs of the estate and its beneficiaries rather than to stand on fine points of law."

Some time elapsed before the trustee as a result of such re-examination concluded that its investment powers were broad enough to enable it to purchase land trust certificates. This court has sustained that conclusion in confirming the right of the trustee to invest in Higbee land trust certificates. By reason of this delay the Rees trust did not complete this purchase until March 6, 1924, at which time it acquired $50,000.00 of Bolton certificates, thereby including an additional $5,000.00 included at the request of H. Maynard Rees, the advisor.

This court is of the opinion that under the circumstances such delay does not justify any different finding than made in the Higbee Fee exception, and therefore finds that exception No. 2 is not well taken, and is therefore overruled.

#### EXCEPTION NO. 3—KIMBALL FEE

Exceptors claim here that the investment of $2,000.00 in so-called Kimball land trust certificates was not authorized under the will and that the trustee was guilty of self-dealing in making this investment. The evidence discloses the fact that the Rees trust made an investment of $2,000.00 in Kimball land trust certificates on August 12, 1922, making such payment on the same day that the trustee acquired this property. The facts in this issue do not differ materially from the facts disclosed by the evidence in regard to the Higbee land trust certificates and Bolton land trust certificates. This court finds that exception No. 3 is not well taken, and is, therefore, overruled.

#### EXCEPTION NO. 4—BANKERS JOINT STOCK LAND BANK OF MILWAUKEE BONDS

This exception concerns the purchase of $26,000.00 par value Bankers Joint Stock Land Bank of Milwaukee bonds. Exceptors contend that

The purchases involved a breach of the trustee's duty of undivided loyalty in that the trustee was guilty of self-dealing and of taking a secret profit.

The evidence discloses that these bonds were acquired by the bond department and were taken up and paid for by the Rees trust upon the same day that they were paid for and received by the Bond department, August 10, 1921. This court is satisfied that this transaction conforms to the practice and procedure followed in relation to the purchase of land

trust certificates, and the facts in this issue do not differ materially from the facts disclosed by the evidence in regard to the purchase of certain of the land trust certificates previously discussed. However, it is the exceptor's contention that the trustee derived an undisclosed profit of $32.50. Little testimony was taken as to these transactions.

Certain records were introduced by the exceptors. Counsel for the trustee in his statement to the court expressed his inability to submit any evidence concerning this charge, stating that the transaction had taken place some twenty-five years ago and that the bond department has been discontinued at least prior to 1933, at which time new federal legislation required the discontinuance of bond departments by banks. Counsel further states that the charge was made either to cover some item of expense connected with the transaction or there was an inadvertent mistake, basing this on the fact that the bank records did not disclose any similar charge made in connection with the purchases by the Rees trust of various other Joint Stock Land Bank bonds, through its bond department.

Here we have a situation where, because of the lapse of time and surrounding circumstances, the court has received little enlightenment from the evidence. That the trustee, because of the lapse of time, has been put at a serious disadvantage, cannot be denied.

In 16 O. Jur 269, there appears the following statement:

"* * * Equity demands that rights should be asserted before lapse of time has made a judicial inquiry difficult and uncertain by reason of the death of parties, the loss of papers and books, the death of witnesses and the intervention of equities. This principle is not intended to safeguard the defendant's interests, but is founded upon public policy. * * *"

A period of twenty-five years has elapsed, since which time the bond department has ceased to exist. The head of this department who undoubtedly could shed light on this transaction, is dead. The amount of $32.50 involved is the only charge of this kind complained of over a period of the trust,— some thirty-five years.

As was said in Bowden v. Citizens Loan & Trust Co., 259 N. W. 815:

"There must of necessity be some reasonable reliance placed upon the integrity and good faith of the trustee."

The court finds that exception No. 4 is not well taken, and is, therefore, overruled.

## EXCEPTION NO. 8—STOCK OF CONTINENTAL SHARES, INC. PREFERRED

## EXCEPTION NO. 9—STOCK OF CONTINENTIAL SHARES, INC. COMMON

These exceptions concern the purchase by the trustee of 250 shares of Continental Shares, Inc., preferred stock for $25,625.00 and the purchase by the trustee of 902 shares of Continental Shares, Inc., common stock for $33,446.50.

The exceptors contend generally,

(a) That Continental Shares was speculative and hence not a proper investment for trust funds.

(b) That it was imprudent to make additional purchases of stock at a time when the Rees trust had already an unduly large proportion (71%) of its holdings in stocks.

(c) The purchase of Continental Shares stock constituted an unlawful delegation and surrender of trustee's investment powers.

Exceptors called expert witnesses to testify in support of their contention that the investment in Continental Shares, Inc. was speculative and imprudent. On the other hand, the trustee called expert witnesses in support of its contention that this investment in Continental Shares was proper and not imprudent under the conditions that existed at the time these various purchases were made, pointing out that the common stock was bought as the result of the exercising of warrants or rights.

It is the contention of the exceptors that the investment in Continental Shares was made on the suggestion of the trustee, and that H. Maynard Rees relied on this recommendation in approving the investment.

On the other hand, the trustee contends and attaches great importance to the fact that this investment in Continental Shares, Inc. was approved by H. Maynard Rees; and that the trustee had no power to make any investments unless and until approved by him.

This Court has weighed the evidence and considered the expert testimony offered by both sides. It is satisfied that the trustee did investigate, and weighed the financial history of the company for the three years prior to making this investment, and that it was informed about and took into consideration the character and experience of its board of directors.

In the opinion of this court too much weight should not be given to the relatively short period of three years that the company had been in existence before the trustee made its

investment, because of the prior experience of the management in the field of investment. The court is impressed by the contention of the trustee that the portfolio of the company was represented by holdings of stock of old established companies representing the iron, steel, public utilities, rubber, paint, railroad and petroleum industries. The trustee maintains that it took into consideration the fact that no such stock holdings in such industries were then in the portfolio of the trust estate. This investment is not to be judged by after events. Should the trustee be surcharged because it failed to forsee the depression that followed not only in this country, but in the entire world?

This court, in an unreported decision in the Stafford case, (Probate Court No. 184-146) quoted from the Conover case, 10 O. O. 481, as follows:

"That this country and the whole civilized world was caught in an economic maelstrom of unprecedented dimensions which has either wrecked or seriously affected almost every line of business in the country, and in fact threatened the structure of government itself, is a fact so well known to all that little evidence on this point would suffice to convince the court that the situation was so unusual and the financial and business world was in such a state of confusion that no trustee as a matter of law, should be held responsible for a depreciation in the value of securities, simply because it pursued a 'Watchful waiting' policy which was the course of action followed by the owners of stock in general throughout the country.

The Court of Appeals in the Stafford case (46 Abs 260) said, on page 268:

"It is a matter of common knowledge, certainly a matter of which the trial court and this court could take judicial notice, even if it were not clear from the evidence, that overnight fortunes were swept out of existence. * * *"

These investments must be judged by the conditions and circumstances which existed at the time they were made and not as the result of knowledge gained subsequently. All that could be expected of the trustee is that it use the degree of skill that an ordinary prudent person would have used under similar circumstances. Mr. Justice Putnam of the Supreme Judicial Court of Massachusetts in 1830 decided the Harvard

College v. Amory case, 26 Mass. 446. His opinion in that case has had and is having far-reaching influence throughout the country. On page 461 of that opinion Judge Putnam states:

"It has been argued, 'that the trustees should have invested in safe and productive stock, at their own and A SOUND discretion, without being governed by the known opinion of the testator; 'that HE was at liberty to speculate, but the trustees were not.' If these positions should be granted, the desired inference would not follow. If the testator, for example, had been in the habit of dealing largely in lotteries and games of hazard, it would undoubtedly not have justified the trustees in making such investments, notwithstanding the testator had been the favorite of fortune. But if the testator had invested his funds to remain permanently in any stock, **that circumstance might well be taken into consideration by the trustee when called to exercise their own best skill and discretion.** They might reasonably and properly inquire and consider what their testator would do in circumstances in which they were placed. Would he recommend an investment that should give simple interest on a loan, or in stock that would probably give much more, and yet have the principal sum reasonably safe?"

And, continuing on page 463:

"**We are of opinion that they had a right to select the stock which they did for that purpose, and that they acted in the premises according to their best skill and discretion. And we have not seen any evidence which would satisfy us that under all the circumstances of the case, they did not act with a sound discretion in making the selection and investment.**"

And, on page 465 this general statement is made:

"Trustees are justly and uniformly considered favorably, and it is of great importance to bereaved families and orphans, that they should not be held to make good, losses in the depreciation of stocks or the failure of the capital itself, which they held in trust, provided they conduct themselves honestly and discreetly and carefully, according to the existing circumstances, in the discharge of their trusts. **If this were held otherwise, no prudent man would run the hazard of losses which might happen without any neglect or breach of good faith.**"

In **Miller v. Proctor**, 20 Oh St 442, the court held, in part 1 of the syllabus:

"Where the trustees act within the scope of their authority, and exercise such prudence, care, and diligence, as men of ordinary prudence, care, and diligence manifest in like matters of their own, they should not be held accountable for losses happening from their management of the trust funds."

As was quoted from the Conover case, supra, in this court's decision in the Stafford case, supra:

"It is true that a general decline in market value of securities prevailed for several years previous to filing the last account, which decline in market values has brought about a tremendous shrinkage in the value of this estate. **The trustee is not liable simply because this shrinkage occurred. The trustee is only liable for the loss to the trust fund when in the exercise of ordinary prudence it could or should have taken the necessary steps** to prevent the loss."

And, in the Stafford case, supra, the Court of Appeals held:

"The care and diligence required of any executor is that which an ordinarily prudent man is accustomed to use in the conduct of his own affairs. **18 O. Jur. page 227, Sec. 180 et seq.**"

I have always liked the statement of Justice Brewer, referred to as Justice Brown in Trustee's brief, of the United States Supreme Court, in U. S. v. Bell Telephone Co., 167 U. S. 224:

"But a wisdom born after the event is the cheapest of all wisdom. Anybody could have discovered America after 1492."

. A careful consideration of the evidence relative to the purchase of Continental Shares, Inc. preferred and common stocks, leads this court to believe that there has not been a sufficient showing that these investments at the time they were made were speculative or imprudent, or, as expressed in Speight v. Gaunt, 22 Ch. D. 727, 746,

"* * * My view has always been this, that where you have an honest trustee fairly anxious to perform his duty and to do as he thinks best for the estate, you are not to strain the

law against him to make him liable for doing that which he has done and which he believes is right in the execution of his duty, without you have a plain case made against him."

Exceptors contend that it was imprudent to make this investment because of the large percentage of the trust (71%) which was then invested in stocks. In this connection, the evidence discloses that approximately 80% of the testator's estate at the time of his death consisted of stocks. The trustee was justified in attaching weight to this percentage.

In Harvard College v. Amory, supra, the court had this to say, page 462:

"In the case at bar, the testator was a man of extraordinary forecast and discretion, in regard to the management of his property. His vast accumulation could not be ascribed to accidental causes, but to calculation and reflection. The fact that he had within three or four years invested nearly half his property in manufacturing stock, was entitled to great consideration and respect, and would, without any change of circumstances, have a strong tendency to justify the selection of the manufacturing stock as a part of the trust fund."

The evidence further discloses that H. Maynard Rees, the advisor, not only urged retention of stocks, but was insistent that stocks be purchased (specifying common stock) on the threat that he would approve no other form of investment. On November 22nd, 1926 H. Maynard Rees wrote the trustee as follows:

"However, I want it understood that I will not approve the reinvestment of the funds so realized in anything but common or bank stock."

Again, on March 15th, 1927:

"But I will disapprove the reinvestment of the funds so realized in anything but a common stock whether industrial, public utility or bank. I think the committee should know this."

Under the circumstances this court is of the opinion that the trustee was not imprudent in making additional stock investments in Continental Shares, Inc.

We now come to the contention of the exceptors that the investment in Continental Shares was an improper delegation

of authority. There seems little doubt that a trustee may delegate certain kinds of powers under certain conditions. Scott on Trusts, paragraph 171-2 holds:

"It is often loosely said that acts which involve the exercise of discretion must be performed by the trustee personally, and that acts which do not involve the exercise of any discretion may be delegated to others; that discretionary powers must be exercised by the trustee himself, but ministerial powers may be delegated. This is not, however, quite exact. The mere fact that the exercise of a power involves a certain amount of discretion does not necessarily make it improper to delegate it, since almost every act involves the exercise of a certain amount of discretion."

However, the exceptors maintain that the nature of the business of Continental Shares, Inc., and the extent of the controlling power by the management over the affairs of this company, including the right of such management to buy or sell securities according to their judgment, without consulting the stockholders, is an improper delegation of authority which is in direct violation of the duties of a trustee. Because of the lack of reported cases on this matter, neither side submitted in their exhaustive briefs much law on the subject. It is understandable, in view of the fact that this type of investment is relatively modern in this country.

Exceptors place considerable stress on the case of Marshall v. Frazier, 80 Pac. 2d, 42, and 81 Pac. 2d, 142 (159 Oregon 491). A study of the facts and law surrounding this case indicates that the governing factors for the decision were different from those involved in the instant case.

The decision in Marshall v. Frazier, supra, has been subsequently modified by two statutory changes, the first indicating that under certain conditions trustees of charitable or educational trusts may invest

"* * * in any management type of investment, trust, corporate or otherwise, * * *"

and the second, Section 40-1213, broadening the powers of trust companies acting as trustees who have discretionary powers of investment

"in corporate stocks or in such securities other than those herein above mentioned; as the trustee may deem prudent and appropriate."

Because of the lack of judicial determination on the subject, and the absence of any law on this question in Ohio, the court has had to look elsewhere and has been benefited by a recent article written by Mayo Shattuck, former President of the Massachusetts Bar Association, author of the Massachusetts Annotations, Restatement of the Law of Trusts, who has been referred to in the briefs of both the exceptors and the trustee. In Volume 25 Boston University Law Review, 1945, page 12, he states:

"When we are speaking of acquiring shares of an investment trust are we describing an **abandonment** of the duties of a trust in any real sense or are we describing a **discharge** of those duties by participation, in the company of other men of prudence in the community, in a reputable management enterprise, the evidence of which participation consists of a readily marketable certificate? Is the trust management in any real or practical sense abandoned? To me it seems that exactly the opposite has taken place. Nor am I alone in this view. Men of prudence, intelligence and discretion are every day acquiring the shares of well seasoned management type investment companies and investment trusts as desirable 'securities' * * *".

Page 13:

"**Now, if it is the intention of modern trust law to place the trustee as nearly as possible in the position of the man of prudence, intelligence and discretion who is making permanent disposition of his own capital, why should not the trustee be extended the same privilege which is every day being exercised by the prudent man who is his model? My answer is that the trustee ought to have that privilege; that there is now no sound reason for denying it to him and that the law must therefore be expected to advance in that direction.**"

And, in conclusion, on page 20:

"On the interesting point of delegation of investment duties, therefore, we are still awaiting a final answer from our highest courts. The ancient principles of the law have the appearance of speaking against us but it is genuinely doubtful whether those principles are applicable to our situation and there are indications that the law is moving in the desired direction."

This court believes that the arguments of Mr. Shattuck are well founded. These are changing times. The law of necessity must follow these changes. In all cases where a trustee is not restricted to statutory investments, but has the power to invest in stocks, it is the opinion of this court that the investment by a trustee in stock of an investment company, or in participating shares issued by an investment trust, does not constitute an improper delegation of authority and power by the trustee. This court is unable to distinguish in this respect between the powers that are exercised as customary functioning by the management of banks, insurance companies, and of any industrial enterprises that have investment portfolios. Clearly, such comparable managements change the investments carried in their portfolios without consulting with stockholders. It is a recognized fact that the trustees have not hesitated to invest in stocks of such other companies herein above referred to, and that where necessary such other stock investments have been approved and the courts have not regarded such other investments as an improper delegation of authority or power.

This court is therefore of the opinion that the exceptions to the investment in preferred and common stocks of Continental Shares, Inc. are not well taken and are, therefore, overruled.

### EXCEPTION NO. 7—STOCK OF UNION-CLEVELAND CORPORATION

The general exceptions relative to this investment are as follows, to-wit:

(a) The trustee failed to exercise due care, skill and caution in investing in stock of Union-Cleveland Corporation because it was a new and untried enterprise, organized to conduct a highly hazardous business.

(b) It was imprudent to invest additional funds in stock at a time when the Rees trust already had too large a proportion (71%) of its holding in stocks.

(c) The purchase of said stock constituted an unlawful delegation and surrender of the trustee's investment powers.

Because of what we have heretofore said in connection with the Continental Shares, Inc., the court need not make any further reference to the above general exceptions (b) and (c). The exceptors, however, contend that under (a) this investment should be rejected because the stock in the company represented a new and untried enterprise. The evidence clearly discloses that this company was organized to conduct the business and activities that had for many years been profitably and successfully conducted by the bond department

of the Union Trust Company; and that in general the personnel that had operated the Union Trust Company's bond department became the management of this corporation. There is nothing in the record which could lead this court to hold that the Union-Cleveland Corporation was in fact a new and untried enterprise operating in an extremely hazardous field.

This court is of the opinion that the exception to the investment in Union-Cleveland Corporation stock is not well taken, and is, therefore, overruled.

### EXCEPTION NO. 10—TRUSTEE'S COMPENSATION
The exceptors contend

"That the trustee committed serious breaches of trust involving self-dealing and failure to exercise proper care, skill and caution in the administration of the Rees trust. Accordingly, its compensation should be disallowed."

In view of the findings of the court, this exception is not well taken, and is, therefore, overruled.

Although these findings are dispositive of the exceptions in their entirety, had there been any doubt in this court's mind as to the ultimate conclusion on any of the exceptions where the court was called upon to weigh the evidence, he would have had to resolve that doubt in favor of the trustee because of the conduct of H. Maynard Rees. The testator's will stipulated that

"Up to July 1, 1918 all investments shall be made with the written approval of my wife, Cornelia M. Rees, if living; after said date, all investments shall be made with the written approval of my son, Henry Maynard Rees, during his life."

The trustee was, therefore, powerless to make any investments unless and until approved by H. Maynard Rees. He is now seeking to surcharge the trustee on behalf of himself for losses resulting from investments made subsequent to July 1, 1918, all of which he had specifically approved. H. Maynard Rees, who was given such power of approval over investments, is a life beneficiary under the last will and testament of William D. Rees, deceased. He was given a limited power of appointment, having the right to dispose of his share of the trust estate to and among his issue.

The record in this case includes evidence as to his training and experience in the financial field. Although he was trained in medicine he abandoned this profession early to embark

upon a business career. He was a banker, head of an industrial firm, member of the faculty of the Harvard School of Business Administration, a director of research for a Boston firm of investment counsel, Standish, Racey and McKay, and subsequently established his own investment counsel firm in Boston. During the last war he served the government as an economist. The foregoing record of his theoretical and practical experience demonstrates that he was unusually and exceptionally well qualified to exercise his power to approve investments.

This court believes that this qualification is further emphasized by the following quotations from a few of the numerous letters which he wrote to the trustee.

The following was included in a letter written to the trustee on December 30, 1923:

"I have unfortunately mislaid the letter in which you stated that doubts as to the legality of the real estate participations had temporarily held up the investments. However, I will outline my feelings on the subject.

. "I feel very strongly that these are the best investments possible for an estate in Ohio, netting as they do, very nearly 6% to my sister and myself and about 5½% to my mother after federal taxes. They are, moreover, as well guaranteed as any bond, and are, therefore, far preferable to the preferred stocks which might bring in an equal revenue. * * *"

His letter written to the trustee on February 5, 1924 inquires as to the possibility of securing the approval of the Probate Court to the purchases of land trust certificates, and he says:

"I do not doubt the legal point is well taken; but I ask you to review the question from all angles. Would it not be possible for you, in the best interests of the esate, to authorize certain investments in fees **even though the technical legal authority was not in the** will? If this were not possible would not The Cleveland Trust Company be able to ask special permission of the Probate Court for such investments, as it did in the matter of the Euclid Avenue lease?"

"I think there is no question of the desirability of this type of investment."

His letter written to the trustee on March 17, 1924 included the following:

"I am loathe to allow a dollar of the real estate participa-

tion fees to get out of the estate and would prefer it if you would find some other security to dispose of."

The following quotation from his letter to the trustee, dated August 29, 1925, expressing his appreciation to the trustee for suggesting to him the purchase of shares in an investment company is especially interesting, in view of his exceptions subsequently filed in regard to the investment in Continental Shares, Inc.:

"You will be interested to hear of my connection with the above investment counsel. They are very well thought of hereabouts.

"Re Association Invest. Co., of which I bought 50 shares last spring, I am certainly indebted to you for the suggestion. As I understand, I now have 250 shares. Purchase price 125; price of new stk. 32½ or 162½ on the old stock."

The following is quoted from his letter to the trustee on October 19, 1925:

"The other real estate fee participations are so fine an investment for the estate, and are now so difficult to place there on account of your legal department, that I do not wish to see them disturbed."

As bearing on his financial and investment qualifications, the following is quoted from his letter to the trustee on September 2, 1926:

"You may not know that I have spent considerable time since moving here in the study of securities and investments. I say this only to explain how I come to have such well defined views on the subject."

The following quotation from his letter to the trustee dated November 16, 1926 expresses his view with regard to investing in common stock:

"I do, however, strongly favor it, provided that the funds would be reinvested in common stocks as allowed under the terms of the will 'transposing like for like'."

The following quotation from his letter of June 11, 1929 expresses his views as strongly favoring common stock investments, in lieu of bonds, mortgages and preferred stock, at which time he was thirty-five years of age:

"Since you cannot see your way clear to investment in the equities of public utility, chemical, electric, etc. manufacturing companies you are in danger of stagnating with bonds, mortgages and preferred stocks."

Quoting further, this letter shows first, the scope of his knowledge concerning investments, and, more important, sounds a warning to the trustee, which heeded by it are the grounds for certain of these exceptions:

"**Such investments are passing off the stage today; to cling to them is to invite reproaches from your beneficiaries when they find that their trust funds have not kept pace with the general increase in wealth in the country. New forms of investment management will supersede the old trust estate if it does not develop along with the trend of times.**"

However, H. Maynard Rees was correct in his observation, if we are in accord with Mayo Shattuck, who wrote some sixteen years later:

"The days are gone forever when the trustee dealt chiefly in 'sound' real estate mortgages and simple secured obligations having a fixed maturity and a stated rate of interest."

In the opinion of this court the foregoing record is clear and positive proof of the outstanding qualifications of H. Maynard Rees, and it indicates a full knowledge and clear understanding by him of the matters submitted to him for consideration, and the court believes that the trustee was justified in giving great weight to his opinions and judgment in regard to investments.

In Lockhart v. Reilly, 25 L. J. Ch. (N. S.) (Eng.) 697, the court said, page 701:

"It is a proposition revolting to one's common understanding that a person should desire his trustee to do a particular act, he being sui juris, and under no influence and then afterwards file a bill against him for having done that which he desired him to do."

His position seems to be little different from that discussed in Hoyt v. Latham, 143 U. S. 553-570:

"No explanation is given for their delay, and none is suggested **except an apparent intention to wait and see what**

the value of these lands were likely to become, and whether it would be more profitable to set aside the sale or let it stand."

It does not seem improper for this court to speculate as to the charges that might have been made against the trustee if, as a result of a difference of opinion, the trustee had failed to make investments which might have increased in value. Bearing on this is the following quotation from the Court of Appeals, in the Stafford case, supra:

"If the stocks had continued to rise after sale by the executors they would have been charged with the same bad faith of which they are now accused because they did not sell in face of the later falling market."

If a judge should permit beneficiaries to avoid every transaction of trustees (which have turned out to be disadvantageous) by showing that the trustees' interests conceivably might have been in conflict with their duties regardless of how honest the trustees, how remote the conflict, however unrelated the loss, then, as Lord Thurlow so ably expressing the sentiments of this court, states in Fox v. Mackreth, 30 Eng. Rep. 148:

"The great and only doubt which I have had from the beginning to the end of this case is, whether the ground upon which I must go, if I affirm this decree, will not by necessary implication extend to many other cases, in which I shall run the hazard of undoing all the common transactions of mankind, and of rendering all their dealings too insecure."

Because of the findings herein made, it is unnecessary for the court to pass upon the trustee's contention that the exceptors are barred by laches, estoppel and acquiescence.

(Emphasis ours.)