Argued and submitted March 27, affirmed on appeal and on cross-appeal
December 9, 1992

In the Matter of the
Conservatorship/Guardianship of
Philip N. Blackman,
an Incapacitated and Protected Person.

Lucretia A. GARDNER,
in her capacity as Successor Conservator
for Philip N. Blackman, a protected person,
and Sanford Blackman,
*Appellants - Cross-Respondents,*

*v.*

Rodney T. COX,
individually and in his capacity
as former Conservator for
Philip N. Blackman, a protected person,
and Western Surety Company,
a South Dakota corporation,
*Respondents - Cross-Appellants.*

(8708-91670; CA A68965)

843 P2d 469

James R. Cartwright, Portland, argued the cause and filed the briefs for appellants - cross-respondents.

Pamela J. Stendal, Portland, argued the cause for respondents - cross-appellants. With her on the briefs were William B. Crow and Miller, Nash, Wiener, Hager & Carlsen, Portland, for respondent - cross-appellant Rodney T. Cox. G. Kenneth Shiroishi and Carney, Allen, Higgins & Tongue, Portland, for respondent - cross-appellant Western Surety Company, joined in the briefs.

Before Buttler, Presiding Judge, and Rossman and De Muniz, Judges.

BUTTLER, P. J.

## BUTTLER, P. J.

This appeal involves two proceedings that were consolidated for trial. In one, Gardner, as successor conservator of Philip Blackman, objected to the final account filed by Cox as conservator of Philip. In the other, Sanford Blackman, a son of Philip, sought to surcharge Cox for alleged breach of his fiduciary duty in managing the conservatorship. Western Surety Company (Western), Cox's surety, was joined as a party to the second proceeding. Gardner and Sanford appeal from a $50,000 judgment against Cox and Western, jointly and severally. Cox and Western cross-appeal from the same judgment and from the part of judgment against Western for attorney fees. We review *de novo* and affirm on appeal and on cross-appeal.

Philip became friends with Cox in 1975. Cox, who had experience investing in the stock market, served as consultant to Philip and his wife, Hency, advising them on investments. With Cox's advice, Philip and Hency purchased 10,000 shares of Borealis Exploration Ltd. (Borealis) common stock in 1983, paying between $.07 and $.15 per share.[1] Later, they purchased additional shares of the stock. Both Philip and Cox later became actively involved in the company.

In 1981, Philip created The Blackman Family Trust[2] and appointed Cox and Cox's wife as co-trustees. The trust instrument provided for distribution to the Blackman children and various charities on the death of Philip and Hency. In 1986, Philip executed his will, nominating Cox as personal representative and naming Hency, his children, certain friends and relatives and various charities as devisees.

After Philip suffered a stroke and entered a coma-like state in the fall of 1987, a conservatorship was created for him. Hency chose Cox as conservator, because he was a friend and because she and Philip trusted his experience with stocks and, in particular, his knowledge about Borealis. She died in December, 1987, and Philip still lives at the Robison Jewish Home.

---

[1] The Blackmans also bought other related stocks. However, the parties focus on the Borealis stock, which constituted the bulk of the Blackmans' investments.

[2] That trust was later revoked.

At the time Cox was appointed conservator, Philip or he and Hency owned stock valued at $348,000, the majority of which consisted of 15,530 shares of Borealis stock.[3] All but 530 of those shares were held by Philip and Hency as joint tenants with the right of survivorship. Accordingly, the Borealis stock could not be sold without her consent and was not in Cox's possession. After Hency's death, ownership of all stocks held by the Blackmans as joint tenants became subject to administration in the conservatorship estate.

From the time that the Blackman's purchased it in 1983, the Borealis stock had fluctuated radically, reaching a high of $47 per share in 1986. During the 18 months before the conservatorship was established, the stock dropped from $47 per share to $22 per share. Yet, Philip and Hency did not sell any of it. Cox filed his first annual account for the conservatorship on March 1, 1989, covering the period October, 1987, through October, 1988. The decrease in fair market value to the conservatorship estate during that period was in excess of $193,000. An order approving his accounting was entered; there was no appeal. During his second year as conservator, the market value of the Borealis stock dropped from $134,460 to approximately $54,000 and, by November, 1989, the conservatorship estate was indebted to the Robison Jewish Home, where Philip was being cared for, for $34,510. Still, Cox refused to sell the Borealis stock and stopped paying Philip's bills, because he wanted to carry out what he understood to be Philip's desire to maximize the benefit to the charities, which were the principal devisees under Philip's will. He believed that the Borealis stock would increase in value, as it had done in the past.

After the hearing, the trial court ordered Cox removed as conservator and entered judgments against him and Western, jointly and severally, for $50,000, against Western for $26,521 for attorney fees and in favor of Western against Cox for $50,000 and $26,521. Appellants assign error to the amount of the award, arguing that the total loss to the estate resulting from Cox's failure to sell, in particular, the Borealis stock at the earliest opportunity totalled $337,000. Cox and Western cross-appeal, assigning error to the court's

---

[3] There is some disagreement concerning the exact number of shares. That is immaterial, however, because of our disposition of the case.

denial of their motion to dismiss, arguing that Cox did not breach his fiduciary duty in any respect and that the court erred in awarding appellants attorney fees. They also argue that, if Cox has any liability, the amount awarded is adequate.

■    In the management of a conservatorship estate, the conservator is required to comply with the "prudent person" standard in ORS 128.057(1):

> "In acquiring, investing, reinvesting, exchanging, retaining, selling and managing property for the benefit of another, a fiduciary shall exercise the judgment under the circumstances then prevailing, which persons of prudence, discretion and intelligence exercise in the management of their own affairs, not in regard to speculation but in regard to the permanent disposition of their own funds, considering the probable income as well as the probable safety of their capital."

Gardner argues that, because Borealis was a speculative stock, it was an improper investment for a conservator to make or to hold. Clearly, it would have been improper for Cox to use conservatorship assets to buy such a speculative stock. *See Marshall v. Frazier*, 159 Or 491, 527, 80 P2d 42, 81 P2d 132 (1938). Cox correctly points out, however, that Philip and Hency had bought the stock before the conservatorship was established and that they had not wanted to sell it. It was Cox's duty to determine whether and when to sell it.

   In making that determination, he was required by statute to consider any known estate plan of his ward. ORS 126.347 provides:

> "In investing the estate, selecting assets of the estate for distribution under ORS 126.317 to 126.327, and utilizing powers of revocation or withdrawal available for the support of the protected person and exercisable by the conservator or the court, *the conservator and the court shall take into account any known estate plan of the protected person*, including the will of the protected person, any revocable trust of which the protected person is settlor, and any contract, transfer or joint ownership arrangement with provisions for payment or transfer of benefits or interests at the death of the protected person to another or others which the protected person may have originated. The conservator may examine the will of the protected person." (Emphasis supplied.)

Although there was nothing in writing indicating that the Blackmans intended not to sell the stock, Cox claims that the trust, wills and Philip's and Hency's statements to him created the impression that their estate plans involved keeping the stock and that he was merely following Philip's wishes by not selling. There is evidence that Philip and Hency wanted to retain the speculative stocks in the hopes that they would make "millions of dollars for the estate instead of a few hundred thousand, so that certain charitable bequests listed in his will would be significant."

■ ■ Notwithstanding the desire of Philip and Henry, however, a conservator's first duty is to preserve and manage the estate for the care of the protected person during his life. *Larsell v. Clarke*, 9 Or App 61, 72, 495 P2d 57, *aff'd* 263 Or 620, 503 P2d 500 (1972). The trial court found that the Blackmans desired to retain the stock but concluded that Cox had an obligation to sell enough stock to realize $50,000 to pay Philip's living expenses and to provide money for his expenses. We agree. We also agree that he had no clear duty to sell the rest of the stock. Although the stock was admittedly speculative, the determination of when to sell speculative stock that had been purchased by the ward and his wife before there was a conservatorship is one that a court should not readily second-guess under all of the circumstances of this case. There is no evidence that Cox profited from retaining Philip's stocks, and there is evidence that Cox genuinely believed that the stock's market value would eventually increase. Accordingly, we agree with the trial court that he breached his fiduciary duty to the extent that he failed to pay bills for Philip's care, but not otherwise.[4]

---

[4] Although it is not clear how the trial court arrived at the amount of $50,000 as damages (the estate owed the Robison Jewish Home only $34,510 at the time of the hearing), neither Cox nor Western cross-assigns error to the amount. They contend that neither of them had any liability. Cox and Western point out, however, that if they are liable, the trial court might have arrived at the amount of surcharge by considering these factors:

(1) There can only be a surcharge from the date of the order approving the first annual accounting (October 24, 1992) to the date Cox was removed (January 19, 1990), because there was no appeal from that order. ORS 126.283(3); *Sheard v. Franks*, 60 Or App 65, 652 P2d 849 (1982); (2) evidence that the market value would drop substantially if it became known that the 15,000 shares were available for sale; (3) because Borealis was a Canadian stock and the Canadian dollar was worth about 77 cents in U.S. dollars, any amount realized would be reduced; and (4) the tax on the capital gain realized would reduce the amount actually realized.

■ ■ Cox and Western cross-assign error to the court's award of attorney fees against Western pursuant to ORS 742.061, which provides:

"If settlement is not made within six months from the date proof of loss is filed with an insurer and an action is brought in any court of this state upon any policy of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount of any *tender* made by the defendant in such action, a reasonable amount to be fixed by the court as attorney fees shall be taxed as part of the costs of the action and any appeal thereon." (Emphasis supplied.)

To come within the statute, a tender must be absolute and unconditional, except that it may be accompanied by a condition on which the tendering party has a right to insist. *Woods v. Dixon*, 193 Or 681, 686, 240 P2d 520 (1952). Before the hearing, Western had made this offer on behalf of Cox, which was refused:

"(a)   All the outstanding shares of stock held by the Conservatorship would be transferred to Mr. Cox;

"(b)   Mr. Cox receive a release from the Conservatorship;

"(c)   In return for the transfer of the stocks, which had a value of approximately $18,000, Mr. Cox offered to bring current a debt owed by the Conservatorship Estate to Robinson [*sic*] Jewish Home in the approximate sum of $34,000.00; and,

"(d)   Mr. Cox would make future payments to the Robinson [*sic*] Jewish Home for the difference between their bill and the Social Security and the pension benefits available to Mr. Blackman."

Cox's offer was conditioned on his being transferred all of the stocks held by the conservatorship estate and was, therefore, not a valid tender. Accordingly, it could not defeat the right to attorney fees pursuant to ORS 742.061.

Affirmed on appeal and on cross-appeal.